HORATIO S. SPRIGG *v.* THOMAS HOOPER.

In an action of boundary between parties, both of whom claim under the United
States, the controversy will be decided according to the laws of this State.

One who holds a title to lands under the United States, cannot, by an *ex parte* sur-
vey, made by another claimant, or by him and a surveyor of the United States, the
common grantor, be deprived of the quantity of land he was previously entitled to,
without his assent.

Any reference to the titles of the parties in an action of boundary, is only for the pur-
pose of establishing the boundaries in accordance with them, and not to determine
who is the legal owner. C. C. 837, 839 841. This action may be brought by the
owner, or by any one who possesses as owner. Ib. 825.

APPEAL from the District Court of Rapides, *King*, J.

*Brent, O. N. Ogden, Dunbar,* and *Hyams,* for the plaintiff.

*Flint,* for the appellant.

GARLAND, J. The plaintiff alleges that he is the owner and
possessor of two tracts of land, lying on the left bank of the
Bayou Robert, the first of which was confirmed to him in person
by the United States commissioners, and the second to George
B. Curtis, under whom he claims by regular mense conveyan-
ces. He alleges, that he is also the proprietor and possessor of
two other tracts, containing the quantity of fifty acres, more
or less, situated in the rear of and contiguous to the front tracts,
which, under the act of Congress, passed in the year 1832, re-
lating to the entry or purchase of lands in Louisiana, in the rear
of front tracts, he purchased from the government of the United
States, as will appear by a receipt, dated March 30th, 1836.
He further says, that the defendant claims to be the owner of a
tract of land in the rear of and adjacent to the land owned by
him, and that the boundaries between the land of the petitioner
and those of the defendant, have never been determined and
fixed. He, therefore, prays, that the boundaries between him-
self and the defendant may be ascertained and fixed by a judg-
ment, and that he may be quieted in his possession.

The defendant for answer, after a qualified general denial,
says, that he holds his land under a title derived from the Spanish
government, and a confirmation thereof by the United States

to Alexander Fulton, and by regular mesne conveyances from him ; that said tract of land has its boundaries well defined, and legally marked by an ancient survey, made under regular and legal authority ; and that he, and those under whom he claims, have had the same in peaceable possession and ownership, by a fixed boundary, for thirty years ; wherefore he pleads the prescription of ten, twenty, and thirty years.

The titles which the plaintiff sets up to the two tracts of land fronting on the Bayou Robert, are derived from Wm. Wiley senr. and Edward Wiley, being what are generally known as donation claims, founded on settlement, by authority of Spanish officers, previous to 20th December, 1803. They were confirmed in the year 1811, by the United States commissioners. In December, 1836, the Wm. Wiley claim was regularly surveyed by an United States surveyor, the survey approved by the surveyor general, and a patent was issued on the 1st October, 1840, to the plaintiff. At what particular period the Edward Wiley claim, which was confirmed to one George B. Curtis, was surveyed and located, is not shown by the evidence ; but it was probably about the time of the other, as a patent was issued for it on the same day. There is a chain of title from Curtis to the plaintiff. The land back of the Wm. Wiley tract, is claimed by the plaintiff, under a purchase made by him, in 1836, of the United States, under the provisions of the act of Congress of the 15th June, 1832, authorizing the inhabitants of this State to purchase the lands in the rear of their front tracts. A patent was issued to the plaintiff for it, on the 4th January, 1841.

The defendant sets up title under a *requête* and certificate of the commandant under the Spanish Government, and a certificate of confirmation, dated in May, 1811, by the United States commissioners to Alexander Fulton, for one thousand superficial *arpens*, to be located in the rear of the lands of Meullon and Pierre Baillio, so as to include a place called the " Water Hole." The certificate says that he shall be entitled to a patent for the aforesaid quantity, " or so much thereof as is not rightfully claimed by any other person." In pursuance of this confirmation, and an order from the legal officer of the United States, a location and survey of this claim was made by Kenneth Mc-

Crummen, a duly authorised United States surveyor, and approved on the 5th of July, 1817. In January, 1819, the defendant purchased, at the probate sale of Alexander Fulton, two lots, or portions of this claim, each lot containing 342 67-100 *arpens*, equal to 290 acres, according to a plan made by the said McCrummen, and he has been in possession ever since.

About the year 1836, or 1837, Phelps, a deputy surveyor, was engaged in making some surveys in the neighborhood of the parties, when, he says, he discovered that McCrummen had committed an error in locating the Fulton claim, by including in it about 81 *arpens* of land more than it called for. There were also other errors in other claims; and he says, that it became necessary to re-survey the township, which he did. In this re-survey, this surveyor says that he altered the surveys of four or five claims. He says that, " when the survey of the township was made, he found a good deal of difficulty with the lines of the Hooper claim," and that both he and the plaintiff were dissatisfied; that " he consequently made a representation to the surveyor general, who instructed witness to locate the claim as it appears on the township map. He did not consult the defendant when he made the change in his claim," and represented it on the township plat. No other authority for making changes in the location of this claim and others, is shown, except this verbal statement of the surveyor, and the fact of the surveyor general approving the act, after it was done.

The other evidence in the cause, it is not necessary to detail at length. Its purport is, that the front and side lines of the plaintiff's front tracts, were marked, for a considerable distance, if not the whole length; but it does not appear that the back lines were measured or marked, until about 1836, when the confliction with the defendant was discovered. There are, also, many statements as to the courses and lengths of different lines, their probable date, the direction of fences, and other such matters. The quantity of land in controversy is about 53 acres, worth, it is said, about $1000.

The cause was tried by a jury, who found a verdict in favor of the plaintiff, for 40 97-100 acres of land, being the quantity of the William Wiley and Curtis tracts, which came in conflict

with the Fulton claim; but for the 12 37-100 acres, purchased as a back pre-emption, the verdict was against him. Both parties asked for a new trial, on the ground of the verdict being against law and evidence, which was refused; and from the judgment rendered on it, the defendant has appealed, and asks a reversal, *in toto*, whilst the plaintiff prays to have the judgment amended, and a decree entered in his favor for the 12 37-100 acres.

This is an action of boundary, and the titles to the lands confirmed, having passed from the United States to both plaintiff and defendant, or their assignors, and the boundaries established by the grantor conflicting, the question properly comes under the laws of the State, and leaves us to settle the controversy. So far as the United States and Fulton, or his assignee, were concerned, the boundaries of his claim were fixed by the survey of McCrummen, made in 1817, until the same were changed by competent authority; but the plaintiff having, under Wiley and Curtis, claims of equal validity and dignity with that of the defendant, could not, by an *ex parte* survey, made by the defendant, or by one made by him and the common grantor, be deprived of the quantity of land he was previously entitled to without his assent, in consequence of that grantor permitting Fulton to include within his boundary, more land than his title called for. Had the land not been granted or confirmed to the plaintiff previous to McCrummen's survey, we are not prepared to say that it could have been granted afterwards, until some legal measures were adopted to set that survey aside. The evidence establishes conclusively, that the plaintiff and the authors of his titles, were in possession of the lands fronting on the Bayou Robert, before Fulton was, and, according to the acts of Congress, those titles were entitled to a certain quantity and depth. The front lines had been ascertained, and the side lines run many years before 1836, Phelps says fifteen years, or more; and all that remained to be done was to fix the back boundary. This the United States did not do, so far as we are informed, until 1836. The defendant could not prescribe under our state laws against them, as he had not a perfect title, the fee or technical legal title being still in them; nor can he, in an action of boundary, prescribe against the plaintiff, until some boundary be

fixed. The articles 819, 820, 821 of the Civil Code, define this action; and the latter article says, that it cannot be prescribed against, unless in the manner and in the cases coming within the meaning of articles 848, 849. The action can be brought not only by the owner, but by any one who possesses as owner; and the defendant cannot require proof of his right of property (Civil Code, arts. 825, 826); but the court, in fixing the boundary, must examine the titles to the land, and fix the boundary, according to them. Articles 837, 839, 841. The reference to the titles is for the purpose of fixing the boundary in accordance with them; but not to decide whether either plaintiff or defendant are the legal owners of the land within it. These positive provisions of the Code, dispose of the bill of exceptions in the record, taken to the admission of evidence to show a title in the plaintiff. It is immaterial whether he is the real owner of the claims of Wm. Wiley and George B. Curtis, or not, if he possess them as owner. We look to the titles, to see where the boundary should be; and we are of opinion that the court and jury came to a correct conclusion in fixing it, as to the Wm. Wiley tract, at the line between the lots B and C, on the plat made by Phelps under the order of the court; and also in fixing the boundary of the Curtis tract, in the manner represented on the said plat. The testimony shows that there is more land within the lines of the Fulton claim, than the title calls for; and by the boundary fixed in the judgment, there is the quantity called for by the titles of Wiley and Curtis, so far as the quantity in the latter claim can be obtained by the extension of the side and back lines. The title to the Fulton claim states that it is to be located in the rear of some other tracts; and there is a clause in the certificate of confirmation, which restricts the quantity, in case it conflicts with any other rightful claim.

The question as to the 12 37-100 acres contained in the figure B, which the plaintiff claims as having been purchased, in 1836, of the United States, as a back emption under the act of Congress of June 15th, 1832, is very different from that of the confirmed claims. As to them, the grantor had said, previous to McCrummen's location of the Fulton claim, that the plaintiff and Curtis should have a certain quantity of land, in a particu-

lar place. ⸳ It was, therefore, proper so to fix the boundary, as to give them the quantity if possible, which has been done ; but the state of the case is different, when the plaintiff comes with a new title to a piece of land, confessedly within the approved boundary of Fulton's claim, of a date long subsequent to that survey, and emanating from a law enacted subsequently to it, and limiting the purchase to " vacant land." 2 Laws Relating to Public Lands. The land covered by this claim was, in June, 1832, beyond all controversy within the boundary of Fulton's claim, the location of which had not then been disturbed or questioned. How then can it be said that it was vacant land, subject to entry by the plaintiff? How could he know, or what right had he to expect, at that time, that there was an error in McCrummen's survey ? and, admitting that he did know that there was an excess in the quantity within Fulton's limits, how could it then be known, that that excess would be taken off immediately in the rear of the Wm. Wiley claim and another adjoining it, so as to give pre-emption rights to the plaintiff and a contiguous proprietor ? It might, with as much propriety, be supposed, that this excess would have been taken off in another place, as in the one it was. There is no good reason shown why it should not have been taken from that portion of the claim sold to Pierre Baillio, at the same sale at which the defendant purchased, or why it should not have been divided between them. We look upon the acts of the surveyor general, and his deputy, Phelps, in setting aside the survey of McCrummen, and altering the lines, without notice to the defendant, as involving assumptions of authority, and questions much too serious to be investigated in this form of action. It seems to us, that a petitory action would be the most proper form, in which this claim could be asserted. We cannot, in an action of boundary, permit the title to the property to be litigated, when it is only proposed to fix a line or boundary between the adjoining claims.

*Judgment affirmed.*