20 So.2d 136

**STATE v. AUCOIN.**

No. 36975.

April 17, 1944.

Rehearing Denied Nov. 6, 1944.

See, also, 204 La. 301, 15 So.2d 313.

Jos. F. Blasi, Jr., John P. Dullenty, J. Michael Early, Frederick J. Gisevieus, and John Blasi, all of New Orleans, for appellant.

Eugene Stanley, Atty. Gen., and Herold, Cousin & Herold, of Shreveport, for appellee.

O'NIELL, Chief Justice.

This is a suit to establish the boundary between the land which was once the bed of Lake Long, in Lafourche Parish, and the land owned by the defendant on the south side of and adjoining the traverse of the lake.

To that end the purpose of the suit was to locate and mark on the ground the traverse line of the lake according to the official plat and field notes of a survey made by Joseph Gorlinski, United States Deputy Surveyor, in 1857. This survey, according to which the lands on the south side of the lake—including the three fractional sections now owned by Aucoin—were granted to the State of Louisiana by the swampland grant of March 2, 1849, was made by Gorlinski under a contract with the United States Land Office dated October 19, 1854, to make a survey of Lake Long, and was approved by the Surveyor General of Louisiana on September 21, 1857, and is the official plat of Township 17 South, Ranges 18 and 19 East, in the General Land Office of the United States and in the State Land Office of Louisiana.

The land owned by Aucoin, the northern boundary of which is the Gorlinski traverse of Lake Long, is described as fractional Sections 56 and 66 (less the NW¼ of SW¼ and S½ of SW¼ of Section 66), and fractional Section 65, in T. 17 S., R. 19 E. Fractional Section 56 is said to have an area of 49.20 acres, fractional Section 66 an area of 111.72, and fractional Section 65 an area of 68.72 acres. These areas are taken from the "Table of Contents" on the margin of the official plat of the Gorlinski survey, according to which the three fractional Sections, together with other lands adjacent to the lake, were conveyed to the State under the swamp land grants of 1849 and 1850 and were conveyed by the State to the Board of Commissioners of the Atchafalaya Basin Levee District. As a matter of fact, the actual area of each of these fractional sections, 56, 66 and 65, greatly exceeds the area stated in the "Table of Contents", according to Gorlinski's traverse of Lake Long, which traverse line is the northern or northeastern boundary of the three fractional sections.

The reason for the dispute over the location of the boundary line on the ground—and for the necessity for retracing it—is that the landmarks or monuments that were placed there by Gorlinski to mark his traverse line according to his field notes have become obliterated, and the water in the lake has receded from its original banks because of artificial drainage.

In 1935 the State entered into an oil and gas lease of the land within the traverse of Lake Long, according to the official plat of the Gorlinski survey, and the lease was afterwards acquired by the Fohs Oil Company. In 1936 the Register of the State

Land Office, under authority of Act 232 of 1934, employed a surveyor, Harry Shutts, of Lake Charles, to resurvey the traverse of Lake Long as surveyed by Gorlinski in 1857, and to mark the line of the traverse on the ground, where it was originally marked by Gorlinski, according to his field notes. The act of 1934 authorizes the Register of the State Land Office to have surveys or resurveys made in order to re-establish the line or lines of any official survey "where the original monuments have been destroyed or lost or are uncertain." Accordingly the traverse of Lake Long was retraced by the surveyor Shutts according to the Gorlinski field notes, in the latter part of 1936, and the Shutts map and field notes were filed in the State Land Office. The Register of the State Land Office accepted the Shutts survey as being a true and accurate location of the traverse of Lake Long, according to the official plat and field notes of the Gorlinski survey. But Octave Aucoin refused to approve the Shutts survey or location of the Gorlinski traverse of Lake Long, as the boundary line between the land claimed by the State on the north side of the traverse line and the land owned by Aucoin on the south side of the Gorlinski traverse line as located by Shutts.

The State then brought this suit, claiming that the survey made by Shutts under the provisions of Act 232 of 1934 was a correct retracement of the traverse made by Gorlinski in 1857 and should be approved as such.

The State averred in her petition that, before she disposed of any land in T. 17 S., R. 19 E., she owned not only the bed of Lake Long but also all of the lands surrounding and adjoining the lake. The State averred that Lake Long was a navigable lake when Louisiana was admitted into the Union, in 1812, and hence that she owned the bed of the lake by virtue of her sovereignty.

She averred that she owned originally all of the land surrounding and adjoining the lake by virtue of the swamp-land grants of 1849 and 1850, including the three fractional sections, 56, 66 and 65, now owned by Aucoin, and that it was a matter of no importance to Aucoin, as defendant in this suit, whether Lake Long was or was not a navigable lake in 1812, because if it was not then a navigable lake it was "overflowed land" in the meaning of the swampland grants of 1849 and 1850, conveying to the State all swamp and overflowed lands in the State, not theretofore disposed of by the United States, specifically, the lands in T. 17 S., R. 18 and 19 E., in which townships the lake is located.

The State averred that she had never disposed of any part of the land embraced within the traverse of Lake Long, as surveyed by the United States Deputy Surveyor Joseph Gorlinski in 1857. She averred that the area known as Lake Long, as surveyed by Gorlinski in 1857, was, prior to any conveyance by the State of any land in T. 17 S., R. 19 E., shown and delineated on the official plat on file in the State Land Office, and that all sales or dispositions made by the State of such lands were made with reference to the official plat of survey.

The State averred that none of the section lines of the sections or fractional sections adjacent to Lake Long were surveyed,—on the ground,—the only line of any of the fractional sections that was ac-. tually surveyed on the ground being the traverse line of Lake Long, as shown on the official plat of the Gorlinski survey. This averment is verified by the fact that all of the section lines, or fractional section lines, except the fractional section lines which form the traverse of Lake Long, are shown on the official plat as broken lines, as compared with the series of solid lines forming the traverse of Lake Long.

The State averred in her petition that under the Acts of Congress of 1849, 9 Stat. 352, and 1850, 43 U.S.C.A. § 982 et seq., granting to the State of Louisiana all swamp and overflowed lands in the State, she selected as swamp and overflowed land inuring to her, and the Secretary of the Interior approved to the State, all of the sections or fractional sections then belonging to the United States and surrounding and adjoining Lake Long, and that among these sections or fractional sections were the fractional Sections 56, 66 and 65, as shown on the official plat of survey of T. 17 S., R. 19 E.

The State averred that, pursuant to the provisions of Act 97 of 1890, creating the Atchafalaya Basin Levee District, and in accordance with the 11th section of the act, the State Auditor and the Register of the State Land Office executed formal instruments of conveyance, or transfers, to the Board of Commissioners of the Atchafalaya Basin Levee District, of the State's lands surrounding and adjoining Lake Long, including specifically the fractional Section 56, said to contain 49.20 acres, the fractional Section 66 (except the previously-sold S½ of SW¼ and NW¼ of SW¼) said to have an estimated area of 320 acres, and the fractional Section 65, said to contain 68.72 acres, all in T. 17 S., R. 19 E., all as shown by the certified copies of the recorded instruments of conveyance annexed to and made part of the State's petition.

The State averred that Octave Aucoin acquired the fractional Sections 56 and 65, and all but the S½ of SW¼ and NW¼ of SW¼ of fractional Section 66, in T. 17 S., R. 19 E., through mesne conveyance from the Board of Commissioners of the Atchafalaya Basin Levee District, having bought the land directly from the Terrebonne Land Company on February 10, 1910.

The State averred that she was, in her sovereign capacity, in possession of the area known as Lake 'Long, and that her lessee was then and had been for a long time producing oil and gas from the land.

The State averred that, notwithstanding the boundary line between her land and that of Aucoin was shown on the official plat of survey under and by virtue of which Aucoin acquired his title, and notwithstanding his land had an area largely exceeding that which he had bought and paid for, he was disputing the fact that the traverse line surveyed by Gorlinski in 1857,

as shown on the official plat, and as retraced by Shutts in 1936, was the true boundary between the land of the State and that of Aucoin.

The State prayed for a judgment fixing and establishing the boundary line as shown on the official plat of survey approved by the Surveyor General on September 21, 1857, as retraced by the Surveyor Shutts under the provisions of Act 232 of 1934, and ordering the line monumented on the ground permanently, as the boundary between the land of the State and the fractional Sections 56, 66 and 65 in T. 17 S., R. 19 E., belonging to Aucoin.

In his answer to the suit Aucoin admitted that he acquired by his deed for Sections 56, 66 and 65 in T. 17 S., R. 19 E., an acreage greatly in excess of the acreage stated in the instruments of conveyance issued by the State Auditor and the Register of the State Land Office to the Board of Commissioners of the Atchafalaya Basin Levee District, and in the subsequent sales by which he, Aucoin, acquired title. He averred that he thereby acquired three complete, square or regular sections, numbered 56, 66 and 65, each containing 640 acres, making a total area of 1,920 acres, instead of three fractional sections bounded on the north side by the Gorlinski traverse of Lake Long as shown on the official map.

He pleaded, in the alternative, and in the event the court should hold that he did not acquire by virtue of his deed three full or regular sections, each having an area of 640 acres, then that he had acquired by the

prescription of 10 years and 30 years those parts of the alleged three regular or square sections which he did not acquire by his deed. And, again in the alternative, he pleaded that, if the court should hold that he did not acquire three regular sections having an area of 640 acres each, either by deed or by prescription, then that he acquired "by accretion and/or dereliction" that portion of the alleged three regular sections which he did not acquire either by deed or by prescription.

Aucoin denied that Lake Long was ever a navigable lake.

He annexed to his answer to the suit— and prayed that the State should answer categorically and under oath—a list of fourteen interrogatories on facts and articles. The questions propounded were very specific and direct in their purpose. The Register of the State Land Office answered the questions specifically, under oath. The facts established by the questions and answers are as follows: That the title by which the State claims the land inside of the Gorlinski traverse of Lake Long is that the lake was a navigable lake when Louisiana was admitted into the Union, and hence that she acquired title to the bed of the lake by virtue of her inherent sovereignty; that the State claims that she acquired title to all of the land surrounding and adjoining the Gorlinski traverse of Lake Long by the acts of Congress of 1849 and 1850, granting to the State all swamp and overflowed lands not then owned or claimed as private land grants; that the Gorlinski traverse of Lake Long and his

field notes, and the Shutts retracement of the Gorlinski traverse of the lake, and Shutts' field notes, are claimed by the State to be correct, and to be an accurate delineation of the boundary line between the land of the State inside of the traverse line and the three fractional sections of land belonging to Aucoin on the south side of the southern traverse line of the lake; that Shutts found the area of the lake, as shown by the Gorlinski traverse thereof, to be 4,228 acres; that the State claims to have been for more than a year before the institution of this suit in actual possession of all of the area inside of the Gorlinski traverse of Lake Long, through a lessee, the Fohs Oil Company, under a mineral lease from the State, and that the Fohs Oil Company commenced operations for the drilling for oil and gas previous to the year 1937 and was continuing the drilling operations at the time of the answering of Aucoin's interrogatories; that nine producing oil wells were completed by the Fohs Oil Company as the State's lessee; that another well was completed and was then testing at the time of the answering of the interrogatories; that the drilling of still another well was commenced; and that all of the wells were drilled in the bed of the lake, in the water or on floating turf.

. The purpose of the interrogatories was to clarify the issues and perhaps to eliminate all that would not be contested in the defendant's answer. In articles 347 and 348 of the Code of Practice it is declared that either party to a lawsuit may annex to his petition or answer interrogatories on facts and articles, to be propounded to the other party and answered under oath "in order to make use of his answers as testimony in support of his demand, or to aid him in his defense."

The case was tried on the issues thus tendered and resulted in a judgment for the State, declaring that the Gorlinski survey of the traverse line on the south side of Lake Long, as shown on the official plat approved by the Surveyor General of Louisiana on September 21, 1857, was the true and correct boundary between the land of the State on the inside or north side of the line, and the three fractional sections, 56, 66 and 65, belonging to Octave Aucoin, and adjoining on the outside or south side of the traverse line. It was decreed also that, inasmuch as the original monuments placed by Gorlinski to mark the line according to his field notes had become lost or obliterated, the line should be retraced and marked or monumented as it was originally traced and marked on the ground, according to the official plat and field notes of the Gorlinski survey. Accordingly, the surveyor, Shutts, was ordered and commissioned by the judge to locate and retrace and preliminarily mark or monument on the ground that part or segment of the original traverse of Lake Long, as surveyed by Gorlinski in 1857, in front of the fractional Sections 56, 66 and 65, in T. 17 S., R. 19 E. It was adjudged and decreed that the State owned the land on the north side of and adjacent to that portion or segment of the Gorlinski traverse line and that the defendant, Aucoin,

owned the three fractional sections, 56, 66 and 65, on the south side of and adjacent to that portion or segment of the Gorlinski traverse line. It was ordered that the surveyor, Shutts, should first serve due and legal notice upon the defendant, Aucoin, and upon his counsel of record, of the date and time when the surveying and marking or monumenting of the line would commence. The Surveyor, Shutts, was ordered to file in the record of this suit, after retracing and marking the Gorlinski boundary line, a complete proces verbal of his work, with a plat and the pertinent field notes of his survey; and that the same should be subject to objection or complaint, and to rejection or correction, at the instance of either party to the suit, before approval by a final judgment of the court.

Aucoin, having been notified by the Surveyor Shutts, was present at the commencement of the survey, with his attorney and a licensed surveyor, D. G. W. Ricketts, employed to represent him. "At the outset" as stated in a written protest which Aucoin served upon the surveyor Shutts, Aucoin objected to Shutts' retracing the line which he had already run. Aucoin contended in his protest that the line was not a correct retracement of the Gorlinski meander line; that the Gorlinski meander was a representation of the mean high-water mark, as Gorlinski found it; that the correct method of reestablishing the Gorlinski meander was to determine first the mean high-water mark, and that that could be done only by running levels or elevations across the banks of the lake.

The surveyor Ricketts, in the written protest, claimed that he had done considerable work "along that line of procedure" and that he had definitely found the Gorlinski meander, or mean high-water mark, to be approximately 1,000 feet northeast of the Shutts meander line; that the Gorlinski meander line as found by Ricketts was on the inside of a ridge called Lake Long Bayou Ridge; and that Shutts would be furnished with a copy of Ricketts' survey. Shutts then, accompanied by Aucoin and his attorney and surveyor Ricketts, proceeded to retrace the Gorlinski traverse of Lake Long,—particularly that segment of the traverse line which forms the northern or northeastern boundary of the fractional Sections 56, 66 and 65, following the courses and distances given in the Gorlinski field notes. Shutts filed a proces verbal of his survey, with a plat and field notes, and a copy of the protest which the defendant and his attorney and surveyor had served upon him at the commencement of the survey.

The State then obtained a rule upon Aucoin to show cause why the survey made by Shutts under the orders of the court should not be approved and homologated by a final judgment, and why the boundary line, as located by Shutts, as the Gorlinski traverse of Lake Long, should not be permanently marked and monumented as the boundary between the land of the State and the three fractional Sections, 56, 66 and 65, belonging to Aucoin.

Aucoin, answering the rule to show cause why the Shutts survey should not be

approved, reiterated the objections which he had served upon Shutts at the commencement of the survey. Aucoin admitted that the surveyor Shutts, after serving legal notice upon him, "did attempt to preliminarily monument on the ground the Gorlinski traverse of the area known as Lake Long lying in front of the defendant's property", but Aucoin averred that Shutts merely retraced the survey which he had made in 1936 "of the traverse of Lake Long lying in front of Sections 56, 66 and 65". Aucoin averred in his answer that Shutts had not found the true boundary line between the area known as Lake Long and the three fractional Sections 56, 66 and 65; and that Shutts' traverse did not represent a correct retracement of the Gorlinski traverse in front of the three fractional sections, 56, 66 and 65. Aucoin annexed to his answer a plat of a survey made by the surveyor Ricketts as a retracement of the Gorlinski traverse line. In that connection Aucoin averred: "that the Gorlinski traverse or meander is a representation of the mean high-water mark as Gorlinski found it; that the mean high-water line that Gorlinski was endeavoring to find is fully shown in the Ricketts survey and work aforesaid."

After an extensive trial of the rule to show cause why the Shutts survey should not be finally approved the court gave judgment approving the survey and ordering the Gorlinski traverse line, as located and retraced by Shutts, to be permanently marked and monumented as the boundary between the land of the State and the three fractional Sections 56, 66 and 65 belonging to Aucoin. He is appealing from both judgments.

His plea of prescription is disposed of by the declaration in Section 16 of Article XIX of the Constitution that: "Prescription shall not run against the State in any civil matter, unless otherwise provided in this Constitution or expressly by law." There is no provision in the Constitution or in any law that can exempt this suit from the declaration that prescription shall not run against the State in any civil matter. Aucoin, in his brief filed in this court, declares that he does not contend that prescription runs against the State but contends that the State transferred all of the swamp and overflowed land in the area between Bayou Lafourche and Bayou Terrebonne in the same way in which the State acquired it, and that the prescription does run against all of Aucoin's authors in title except the State. The answer to this of course is that Aucoin's plea of prescription is urged against the State, and not against any one claiming title from the State. If the land claimed by Aucoin in this suit on the north side of the Gorlinski traverse line belongs to the State Aucoin cannot successfully claim title to that land by a plea of prescription. The instrument of conveyance by which the State Auditor and the Register of the State Land Office under authority of Act 97 of 1890, conveyed to the Board of Commissioners of the Atchafalaya Basin Levee District the fractional Sections 56, 66 and 65 did not

purport to convey any land on the north side or northeast side of the Gorlinski traverse line, as shown on the official plat of survey. Therefore the defendant's alternative plea that he acquired title by prescription to lands on the north side or northeast side of the Gorlinski traverse line, which appears on the official plat of survey as the northern or northeastern boundary of the fractional Sections 56, 66 and 65, cannot prevail against the State.

■ Aucoin pleads also the prescription or limitation of six years, under the provisions of Act 62 of 1912. The act declares that all suits or proceedings by the State or by any one else to annul any land patent issued by the State, or any transfer of property made by any subdivision of the State, shall be barred by prescription unless the suit or proceeding is brought within 6 years from the issuance of the patent. The statute has no application to this case because neither has the State nor has the levee board ever issued a patent or other instrument purporting to convey any lands on the north side or northeast side of the Gorlinski traverse line in front of the fractional Sections 56, 66 and 65, according to the official plat of survey of T. 17 S., R. 19 E.

■■ Referring now to the appellant's first defense—that he is entitled not only to the three fractional Sections 56, 66 and 65, but to three complete or square sections, or regular sections containing 640 acres each,—in place of the three fractional sections—the defense is not better founded than the pleas of prescription.

Ordinarily, a regular section of land, in place, is a square area measuring 80 chains on each of its 4 sides and containing therefore 640 acres. But the term "fractional section" means a fractional part of a regular section. The law on the subject of government surveys provides that every township shall be divided into 36 regular or square sections measuring 80 chains on each side and arranged in 6 horizontal rows of 6 sections each, commencing with Section 1 in the northeast corner of the township and ending with Section 36 in the southeast corner. But the lawmaker has recognized that that arrangement cannot be carried out in surveying townships containing obstructions, such as navigable bodies of water, or private land grants. In such cases, when the United States Deputy Surveyor comes in contact with such an obstruction as a navigable body of water, or a private land grant, it is necessary to lay out only a fraction of a regular section, and such a fraction is called a fractional section. 43 U.S.C.A. secs. 751, 752, and in cases where the government surveyor gives section numbers to the private land grants within the township the numbers given to the regular sections and fractional sections may go above the number 36,—as in the case of fractional Sections 56, 66 and 65, in T. 17 S., R. 19 E. The authority of the government surveyors to make fractional sections where a navigable body of water or other obstruction prevents the making of a regular section, in place, was recognized in Gazzam v. Phillips' Lessee, 20 How. 372, 15 L.Ed. 958, decided in 1858.

The decision has been affirmed many times, as shown by the cases cited in 50 C.J. 911, supporting this declaration: "The government survey creates and does not merely identify sections and boundaries." See also United States v. Morrison, 240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599. And in Cox v. Hart, 260 U.S. 427, 436, 43 S.Ct. 154, 157, 67 L.Ed. 332, 337, it is said: "A survey of public lands does not *ascertain* boundaries; it *creates* them."

The fractional Sections 56, 66 and 65 came into existence only when they were created by the approval of the government survey by the Surveyor General on September 21, 1857.

In 43 U.S.C.A. sec. 751 are the rules adopted by Congress for surveying public lands; and among these rules is the one requiring every surveyor to note in his field book the physical objects along his path, including all water courses over which the line which he runs may pass. The statute provides finally: "These field books shall be returned to the Field Surveying Service, which shall cause therefrom a description of the whole lands surveyed to be made out and transmitted to the officers who may superintend the sales. He shall also cause a fair plat to be made of the townships and fractional parts of townships contained in the lands, describing the subdivisions thereof, and the marks of the corners."

In 43 U.S.C.A. sec. 752, in the second paragraph, it is required: "The boundary lines, actually run and marked in the surveys returned by the Field Surveying Service, shall be established as the proper boundary lines of the sections, or subdivisions, for which they were intended, and the length of such lines, as returned, shall be held and considered as the true length thereof."

And in the third paragraph of that section of 43 U.S.C.A. it is provided: "Each section or subdivision of [a] section, the contents whereof have been returned by the Field Surveying Service, shall be held and considered as containing the exact quantity expressed in such return"; et cetera.

In the case of Gilmore v. Lyon Lumber Co., 159 La. 18, 105 So. 85, 87, the plaintiff held a patent for a quarter-section, described in the patent as SE¼ of Sec. 8 containing 160.66 acres; but the government survey showed that a part of the SE¼ of Sec. 8 was embraced in a private land grant belonging to the defendant, and hence that the SE¼ of Sec. 8 was in fact a fractional quarter-section having an area of only 139.26 acres. In deciding that the plaintiff's title to what was described in his patent as the SE¼ of Sec. 8 containing 160.66 acres was not valid except for the fractional quarter-section having an area of 139.26 acres, it was said: "Plaintiff's case depends upon his contention that the SE¼ of section 8 is a regular quarter section and contains 160.66 acres; but the latest government survey, with the field notes attached, approved by the surveyor general on the 7th of July, 1856, shows that the SE¼ of section 8 is a fractional quarter section (the southeast corner being in the William Leech claim No. 46),

and has an area of only 139.26 acres. It is true, the copy of the patent that was issued to plaintiff's author in title gives the area of the fractional SE¼ of section 8 as 160.66 acres, but it could not have that area unless it was a whole and regular quarter section; and it is described in the patent as the 'fractional SE¼' etc. The error made in stating the area as 160.66 instead of 139.26 acres seems to have resulted from observing an old plat, made in 1845, which did not show the location of the William Leech claim No. 46."

It is plain therefore that the deeds describing the fractional Sections 56, 66 and 65, in Aucoin's chain of title, do not call for three regular sections, or square sections, having an area of 640 acres each.

Inasmuch as the State owned originally the land now owned by Aucoin, as well as the adjacent land in the bed of Lake Long,—and inasmuch as Aucoin's title comes from the State,—the burden of proof is upon him to show that he acquired from the State the extent of the land that he now claims. Rev.Civ.Code, art. 844. But the burden of proof in this case is not a matter of great importance because every deed that forms a link in Aucoin's chain of title shows that the extent of the land that he acquired stops at the Gorlinski traverse line, marking the northern or northeastern boundary of fractional Sections 56, 66 and 65.

Aucoin's chain of title is as follows:

(1) The selection by the State and the approval to the State of fractional Sec-
tions 56, 66 and 65, under the swamp land grant of March 2, 1849;

(2) The transfer of the three fractional sections (all except the NW¼ of SW¼ and S½ of SW¼ of fractional Section 66) by the State to the Board of Commissioners of the Atchafalaya Basin Levee District, by the instrument of conveyance signed by the State Auditor and Register of the State Land Office, under authority of the 11th section of Act 97 of 1890;

(3) The sale by the board of commissioners of the levee district to George G. Metzger;

(4) The sale by George G. Metzger to the Terrebonne Land Company;

(5) The sale by the Terrebonne Land Company to Octave Aucoin on February 10, 1910.

In the act of sale by the Terrebonne Land Company to Aucoin the land sold is described as having an area of 517.92 acres, and as being composed of fractional Section 56, said to contain 49.20 acres, and all except the S½ of SW¼ and NW¼ of SW¼ of fractional Section 66, estimated at 320 acres, and fractional Section 65, said to contain 68.72 acres, all in T. 17 S., R. 19 E., and the S½ of NE¼ of Section 50, said to contain 80 acres but in fact containing 74.24 acres, in the adjoining township—T. 17 S., R. 18 E. The areas ascribed to fractional Sections 56 and 65 conform exactly with the areas given in the "Table of Contents" on the margin of the official survey of T. 17 S., R. 19 E. And the total area stated in Aucoin's deed, 517.92 acres, checks exactly if the esti-

mate of 320 acres in fractional Section 66 in T. 17 S., R. 19 E., and the estimate of 80 acres in the S½ of NE¼ of Section 50 in T. 17 S., R. 18 E., were accurate estimates. But a computation made of the actual area in the three fractional sections, 56, 66 and 65, according to Shutts' retracement of the Gorlinski traverse line, shows that there is an excess of 349.88 acres in the three fractional sections; i. e. an excess of 50.48 acres in fractional Section 56, an excess of 170.60 in fractional Section 66, and an excess of 128.80 acres in fractional Section 65, in T. 17 S., R. 19 E. The official plat of T. 17 S., R. 18 E., shows that the S½ of NE¼ of Section 50 has an area of 74.24 acres, instead of 80 acres. The net result is—and it is not disputed—that Aucoin got 862.04 acres, instead of 517.92 acres, or 344.12 acres more than he paid for, in his purchase from the Terrebonne Land Company. The surveyor D. G. W. Rickett, who represented Aucoin when Shutts made his retracement of the Gorlinski traverse line in front of fractional Sections 56, 66 and 65, contended that the line should be located about 1,000 feet northeast from the line where Shutts located it. As the distance of 1,000 feet is slightly more than 15 chains, and as the three fractional sections, 56, 66 and 65, have a combined frontage of nearly 185 chains along the Gorlinski traverse line, it would add about 277.5 acres more to the area of Aucoin's land, and increase it to 1,139.54 acres, approximately, if the Gorlinski traverse line in front of the fractional sections, 56, 66 and 65, should be located where the surveyor Ricketts locates it. And, if Aucoin should be allowed three regular sections, having an area of 640 acres each, in place of the three fractional sections, 56, 66 and 65, he will have acquired an area of 1,920 acres plus the 74.24 acres in Section 50, in T. 17 S., R. 18 E.,—or a total area of 1,994.24 acres, instead of the 517.92 acres, for which Aucoin paid $7,768.80—as stated in the deed,—which was exactly $15 per acre.

If the fact that the three fractional sections, 56, 66 and 65, have a greater area, according to the survey and computation made by Shutts, than the area stated in the "Table of Contents" on the margin of the official survey, has any significance —or is any indication—as to whether Shutts has located the Gorlinski traverse line where Gorlinski located it on the ground, the indication would be, not that Shutts has located the line too far southward—as Ricketts contends—but that Shutts has located the line too far northward and has thus increased the area of the three fractional sections. It is not likely, though, that Shutts made a mistake, one way or the other, in his retracement of the Gorlinski survey, because Shutts followed Gorlinski's field notes, step by step. In fact it is certain that the error in the statement of the areas of the fractional sections, 56, 66 and 65, is in the estimates appearing in the "Table of Contents" on the margin of the official survey.

In the act of sale by the Terrebonne Land Company to Aucoin the three fractional sections, 56, 66 and 65, are called "fractional sections".

In the sale by George G. Metzger to the Terrebonne Land Company, on December 29, 1900, the three fractional Sections 56, 66 and 65 are described as follows: "all Sec. 56 containing 49.20 acres; * * * all frc. Sec. 65 containing 68.72 acres; all frc. Sec. 66 except S½ of SW¼ & NW¼ of SW¼, containing 320 acres; * * * in T.17 S., R.19 E." In that description the fractional Sections 66 and 65 are called "fractional sections". Fractional Section 56 is not called a "fractional section", but the area given, 49.20 acres,—in comparison with the 640 acres in a regular section,—shows that Section 56 is in fact a "fractional section".

The act of sale by the Board of Commissioners of the Atchafalaya Basin Levee District to George G. Metzger, dated December 14, 1900, conveyed 119,037.73 acres of land, described specifically, according to townships, sections, and subdivisions of sections; and among the many tracts specifically described are the three fractional sections now owned by Aucoin, thus: "All Sec. 56, containing 49.20 acres; * * * all frl Sec. 65, containing 68.72 acres; all frl Sec. 66, except S½ of SW¼ & NW¼ of SW¼, containing 320 acres. * * * All in T.17 S., R.19 E."

In this sale, by the levee board to Metzger, fractional Sections 65 and 66 are called "frl." sections. Fractional Section 56 is not called a "fractional section" but the area given, 49.20 acres, in comparison with the 640 acres in a regular section, shows that Section 56 also is a fractional section.

And in this sale, immediately following the description of the several tracts aggregating 119,037.73 acres, is a declaration which expressly excludes from the sale any land embraced within the Gorlinski traverse of Lake Long,—thus: "All the above described lands were granted to the State of Louisiana by the United States of America by the Acts of Congress known as the Swamp Land Act or Acts and were donated by the State of Louisiana to the Atchafalaya Basin Levee District by Act of the General Assembly of said State for the purpose of aiding said Levee District in protecting and extending its Levee System."

The declaration which we have quoted is, substantially, that the lands which the State conveyed to the levee board by Act 97 of 1890 and which the levee board sold to Metzger were (aside from the lands that were forfeited for taxes) only such lands as the State had acquired from the United States by the swamp-land grants of 1849 and 1850,—which of course did not include any land inside of the Gorlinski traverse of Lake Long.

The sale made by the levee board to Metzger was made pursuant to a contract dated July 9, 1900, by which the board of commissioners promised to sell to Edward Wisner and John M. Dresser, or to any person or persons whom Wisner and Dresser might thereafter designate, all of the lands donated to the levee board by Act 97 of 1890, creating the Atchafalaya Basin Levee District. No land was specifically described in the promise

to sell to Wisner and Dresser or to any one whom they might designate. Aucoin does not trace his title to or through Wisner and Dresser, but traces it directly through George G. Metzger to the levee board.

In the list of lands transferred by the State to the levee board under the provisions of Section 11 of Act 97 of 1890 the fractional sections now claimed by Aucoin are described thus: "All Sec. 56 [containing] 49.20 acres; all Frc. Sec. 65 [containing] 68.72 acres; all Frc. Sec. 66, except S.½ of S.W.¼ & N.W.¼ of S.W.¼, (estimated) 320 acres".

The total area ascribed to the three fractional sections therefore is 437.92 acres; which, when added to the adjoining tract said to contain 80 acres which Aucoin bought in Section 50 in the adjoining township, makes a total area of 517.92, which is exactly the area given in the act of sale from the Terrebonne Land Company to Aucoin. The fractional Sections 65 and 66 are called "Frc." sections in the instrument of conveyance signed by the State Auditor and the Register of the State Land Office. Although the fractional Section 56 is not called a "fractional section" in this instrument of conveyance, the area given, 49.20 acres, in comparison with the 640 acres in a regular section, is a recognition that Section 56 is only a fractional section.

There is nothing in the instrument of conveyance by which the State transferred the three fractional sections, 56, 66 and 65, to the levee board, or in the act of sale

by the levee board to Metzger, or in the act of sale by Metzger to the Terrebonne Land Company, or in the act of sale by the Terrebonne Land Company to Aucoin, that purports to transfer any land on the north side or northeast side of the Gorlinski traverse line in front of the three fractional sections.

Not only does the list of lands described in the certificate of conveyance by which the State Auditor and the Register of the Land Office, on behalf of the State, transferred to the levee board certain lands,—including fractional Sections 56, 66 and 65,—embrace only lands acquired by the State by virtue of the swamp-land grants of 1849 and 1850, but at the end of the instrument of conveyance is the following certificate:

"I, James M. Smith, Register of the State Land Office of Louisiana, do hereby certify that the foregoing is a full, true and correct list of vacant swamp lands of the State of Louisiana, situated within the Parishes of Lafourche and Terrebonne, and embraced within the limits of The Atchafalaya Basin Levee District, inuring to said State under the provisions of Act 87 of the Congress of the United States, approved March 2, 1849, and Act No. 34 approved September 28, 1850.

"And I do further certify that the records of this office show that all of said lands have been duly approved to the State of Louisiana by the Honorable Secretary of the Interior for the United States as provided by said acts of Congress."

In that connection the extracts from the tract book in the land office, showing all of the original entries in T.17 S., R.18 E., and T.17 S., R.19 E., in which two townships Lake Long is embraced, disclose that all of the vacant lands surrounding Lake Long were selected by and approved to the State under the swamp-land grants of 1849 and 1850. There is no showing that any land inside of the Gorlinski traverse of Lake Long was ever approved to or selected by the State as swamp or overflowed land. From this comes the inescapable inference that the Surveyor General of Louisiana and the Commissioner of the General Land Office recognized that Lake Long was a navigable body of water and hence that the State owned the bed of Lake Long, as defined by the Gorlinski survey, by virtue of her sovereignty. On September 21, 1857, when the Surveyor General approved the Gorlinski survey of Lake Long, and on the same day selected for approval to the State the land surrounding and adjoining the Gorlinski traverse of Lake Long, and particularly fractional Sections 56, 66 and 65 in T.17 S., R.19 E., the evidence concerning the navigability of the lake in 1812 was more available than it is today.

The extracts from the tract book show also that the three fractional sections, 56, 66 and 65, were selected by the Surveyor General on September 21, 1857, and that the selections were approved by the Secretary of the Interior on April 10, 1877. The date of the selection, September 21, 1857, is the date on which the Surveyor General approved the Gorlinski survey. And the areas stated on the tract book are the same as the areas ascribed to the three fractional sections, 56, 65 and 66, in the "Table of Contents" on the margin of the Gorlinski survey; that is, 49.20 acres, 68.72 acres and 111.72 acres, respectively.

The abstract of the records in the land office shows also that all of the three fractional sections, 56, 65 and 66 (except the NW¼ of SW¼ and S½ of SW¼ of fractional Section 66), were transferred to the Atchafalaya Basin Levee District on April 26, 1901, under the provisions of Section 11 of Act 97 of 1890. The reason why the NW¼ of SW¼ and S½ of SW¼ of fractional Section 66, containing 120 acres, was excluded from the transfer of the three fractional sections to the levee board on April 26, 1901, under the provisions of Section 11 of Act 97 of 1890, is explained in a notation on the tract book; the explanation being that the NW¼ of SW¼ and S½ of SW¼ of fractional Section 66, together with all of the adjoining Section 76 on the south side of fractional Section 66, was patented by the State to Mrs. Phoebe Pierce on October 10, 1859.

The most convincing proof that the selection of the three fractional sections, 56, 66 and 65, by the Surveyor General, for approval to the State under the swamp-land grant of 1849, was made with reference to the Gorlinski survey, is that the selections were made on the same day on which the Surveyor General approved the Gorlinski survey. All of which merely demonstrates that none of the land described as fractional Sections 56, 66 and

65 extended northward beyond the Gorlinski traverse line on the south side of Lake Long.

■ Aucoin's contention that, by Act 97 of 1890, the State transferred to the Atchafalaya Basin Levee District all of the land then or thereafter owned by the State within the Levee District is a mistake. It is well settled that the acts of the Legislature creating the several levee districts and transferring to the board of commissioners the lands belonging to the State within each district, such as Act 97 of 1890, creating the Atchafalaya Basin Levee District, were not transfers in praesenti, but were merely promises to transfer the lands to the boards of commissioners, respectively, as and when demanded. In fact it is declared in the statutes themselves—specifically in Section 11 of Act 97 of 1890—that the title is not conveyed by the broad and general terms of the act, and will not pass from the State to the levee board, for any tract of land, until an instrument of conveyance is signed and issued by the State Auditor and the Register of State Land Office, describing and conveying the land for which the board of commissioners of the levee district or the president thereof shall demand an instrument of conveyance,—and until the instrument of conveyance is recorded in the office of the recorder in the parish in which the tract of land that is conveyed is situated. We quote the declaration from section 11 of the statute,—thus: "After the expiration of said six months [allowed as an additional period of grace for the redemption of lands theretofore forfeited for delinquent taxes] it shall be the duty of the Auditor and the Register of the State Land Office on behalf of and in the name of the State, to convey to the said Board of Levee Commissioners, by proper instruments of conveyance the lands hereby granted or intended to be granted and conveyed to said board, whenever from time to time said Auditor and said Register of the State Land Office, or either of them, shall be requested to do so by said Board of Levee Commissioners, or by the president thereof, and thereafter said president of said board shall cause said conveyances to be properly recorded in the recorder's office of the respective parishes wherein said lands are or may be located, and when said conveyances are so recorded the title to said land, with the possession thereof, shall, from thenceforth vest absolutely in said Board of Levee Commissioners, its successors or grantees."

In the following cases it was decided, according to the provisions in the statutes creating the several levee districts throughout the State, that the title to the lands conveyed in the general terms of the statute would not pass to the board of commissioners of the levee district until an instrument of conveyance would be signed by the State Auditor and the Register of the State Land Office and be recorded in the conveyance records in the parish where the land described in the instrument is situated,—viz.: McDade v. Bossier Levee Board, 109 La. 625, 33 So. 628; Williams v. White Castle Lumber & Shingle Co.,

114 La. 448, 38 S. 414; St. Paul v. Louisiana Cypress Lumber Co., 116 La. 585, 40 So. 906; State v. Cross Lake Shooting & Fishing Club, 123 La. 208, 48 So. 891; Hartigan v. Weaver, 126 La. 492, 52 So. 674; State ex rel. Atchafalaya Basin Levee Board v. Capdervielle, 142 La. 111, 76 So. 327; Atchafalaya Land Co. v. Grace, 143 La. 637, 79 So. 173; State ex rel. Board of Com'rs of Caddo Levee District et al. v. Grace, 145 La. 962, 83 So. 206; State v. Capdeville, 146 La. 94, 96, 83 So. 421; Atchafalaya Land Co. v. F. B. Williams Cypress Co., 146 La. 1047, 84 So. 351, decree affirmed 1922, 258 U.S. 190, 42 S.Ct. 284, 66 L.Ed. 559; Atchafalaya Land Co. v. Dibert, Stark & Brown Cypress Co., 157 La. 689, 102 So. 871; State ex rel. Board of Com'rs of Tensas Basin Levee Dist. v. Grace, 161 La. 1039, 109 So. 830; Board of Com'rs of Tensas Basin Levee Dist. v. Hardtner et al., 164 La. 632, 114 So. 494; Ballard Island Oil & Gas Co. v. Douglas, 172 La. 385, 134 So. 257; State ex rel. Fitzpatrick v. Grace, 187 La. 1028, 175 So. 656; Standard Oil Co. of Louisiana v. Allison, 196 La. 838, 200 So. 273.

In McDade v. Bossier Levee Board, 109 La. at page 638, 33 So. at page 633, in a per curiam refusing a rehearing, it was said:

"Defendant board was created by Act No. 89 of 1892, the ninth section of which granted to it the lands within the limits of the levee district belonging at the time to the state, or which might thereafter be acquired by the state within such limits; but by the terms of said ninth section this grant was not to become operative until formal acts of conveyance of the lands so donated shall have been made to the levee board by the auditor of the State and the Register of the State Land Office."

"Now, the Auditor of the State and the Register of the State Land Office did not execute formal conveyance of the lands in question in this suit to the board until April, 1901. So that the board's title and right of possession began only from that date."

In St. Paul v. Louisiana Cypress Lumber Co., 116 La. at pages 593, 594, 40 So. at page 909, referring to Act 97 of 1890, creating the Atchafalaya Basin Levee District, it was said:

"The defendant's contention is that the grant by the state of these lands * * * was a grant in praesenti, and that the provision for the making out of a list by the auditor and the Register of the Land Office, was intended as descriptive, and that instead of being a condition precedent, it was a condition subsequent, and, as such, could only be taken advantage of by the grantor in the event of failure to make out the list.

"This argument of learned counsel for defendant would have force were it not that this court has taken a contrary view in a decision recently handed down. As this decision relates to real property, it can be set aside only upon most convincing grounds. It has become a rule of property.

"Under the interpretation in the decision cited, infra, the clause is not directory, but mandatory. Williams v. White Castle Lumber [& Shingle] Co., 114 La. 450, 38 So. 414."

In State v. Cross Lake Shooting & Fishing Club, 123 La. at page 214, 48 So. at page 893, it was said: "In our opinion, the levee board acquired no title to the· lands in dispute under the act of 1892, because no deed of conveyance thereto was ever executed by the Auditor and Register, or either of them, and, of course, no such deed was ever recorded, and as for the same reason, the board acquired no title under Act No. 160, p. 242 of 1900, the argument that the title acquired under that act inured to the benefit of the defendant has nothing to rest on."

In the syllabus in Atchafalaya Land Co. v. Dibert, Stark & Brown Cypress Co., 157 La. at page 690, 102 So. 871, 872, the rule is stated thus: "Grant of public lands to levee board under Act No. 97 of 1890 held not in præsenti, but mere grant of right to acquire them by conveyance from proper state officers."

In State ex rel. Board of Commissioners of Tensas Basin Levee Dist. v. Grace, 161 La. at page 1042, 109 So. at page 831, it was said: "It has been held under acts making similar grants to other levee boards in the state, worded identically, or practically so, as the present act, that the grants made therein are not grants in præsenti, and do not convey title until proper instruments of conveyance, executed by the auditor and the register of the state land office, are recorded in the parishes where the lands lie."

In Ballard Island Oil & Gas Co. v. Douglas, 172 La. at page 386, 134 So. at page 258, it was said: "These were not grants in praesenti, but grants of the exclusive right to the lands, with the right in the board of commissioners of the district to have the lands conveyed to the Caddo levee district by formal act."

In Standard Oil Co. of Louisiana v. Allison, 196 La. at page 850, 200 So. at page 276, it was said: "The jurisprudence of our State is well settled that the grants of lands by the State to the various Levee Boards were not grants in praesenti and that title and possession thereof remain in the State and under the control of the Legislature, which has authority to withdraw such grants until the conditions required by the statute to transfer ownership to the Levee Boards have been met."

The fact that the Board of Commissioners of the Atchafalaya Basin Levee District has not obtained an instrument of conveyance for any land inside of the Gorlinski traverse of Lake Long during the fifty-four years since the levee district was created is an indication that it was not intended by Act 97 of 1890, creating the levee district, to transfer to the levee board any land inside of the Gorlinski traverse of Lake Long. In fact it was held in the case of State ex rel. Board of Commissioners of Atchafalaya Basin Levee District v. Capdeville, State Auditor, 146 La. 94, 83 So. 426, that the State did not intend by Act 97 of 1890 to trans-

fer to the levee board any land that had once been a part of the bed of any navigable body of water within the levee district

Inasmuch as the levee board did not acquire any land inside of the Gorlinski traverse of Lake Long, it is not possible that Aucoin or any of his authors in title could have acquired from the levee board any land inside of the Gorlinski traverse of Lake Long.

Counsel for Aucoin contend that, even if the area composing fractional Sections 56, 66 and 65 did not extend northward beyond the Gorlinski traverse line at the time when the levee board acquired these fractional sections from the State, the area has been augmented by the process of accretion and dereliction—or by either accretion or dereliction—so as to extend all the way to the middle of the bed of the lake.

In that connection it is contended that the description in the instrument of conveyance by which the State transferred to the levee board fractional Sections 56, 65 and all except the 120 acres forming the NW¼ of SW¼ and S½ of SW¼ of fractional Section 66 should be construed as extending northward beyond the Gorlinski traverse line to the water's edge. And from this it is argued that the levee board acquired from the State, and that Aucoin acquired by mesne conveyances from the levee board, the riparian rights of a landowner whose land borders upon a lake.

■ Conceding, for the purpose of the argument, that the area of the fractional Sections 56, 66 and 65 did extend north-

ward beyond the Gorlinski traverse line, to the edge of the water, at the time when the levee board acquired title from the State, the question arises: What are the riparian rights of one whose land borders upon a lake, if the bed of the lake belongs to the State? Certainly the riparian rights of an owner of land bordering upon a lake do not entitle him to become the owner of the bed of the lake by effect of its becoming dry, either in whole or in part, if the State owns the bed of the lake while it is covered with water. That is true with regard to both navigable lakes and nonnavigable lakes.

■ The law on the subject of acquiring title to land by the processes of accretion and dereliction is in articles 509 and 510 of the Civil Code, which articles deal with riparian rights only "on the shore of a river or other stream", or on "running water retiring imperceptibly from one of its shores and encroaching on the other." These articles are not applicable to lands bordering upon a lake,—upon either a navigable lake or a nonnavigable lake. Article 509 declares that the accretions which are formed successively and imperceptibly on any land situated on the shore of a *river or other stream* are called alluvion, and that the alluvion belongs to the owner of the land situated on the edge of the water, *whether it be a river* or [other] *stream,* and whether the stream be navigable or not navigable. And article 510 declares that the same rule applies to derelictions formed by *running water* retiring imperceptibly from one of its shores and encroaching upon the other. This

article declares that the owner of the land adjoining the shore which is left dry has a right to the dereliction, but that the owner of the land on the opposite shore has no claim for the land that he has lost by the encroachment.

It has never been held by this court that the riparian rights defined in articles 509 and 510 of the Civil Code, of landowners whose lands border upon a river or other stream, are applicable also to a landowner whose land borders upon a lake, if the bed of the lake belongs to the State. On the contrary, it has been decided several times and consistently that, if a state-owned lake, whether navigable or not navigable, goes dry, either wholly or partially, by either natural or artificial causes, the land from which the water recedes does not become the property of the riparian owner but remains the property of the State. Zeller v. Southern Yacht Club, 34 La.Ann. 837; McDade v. Bossier Levee Board, 109 La. 625, 33 So. 628; Slattery v. Arkansas Natural Gas Co., 138 La. 793, 70 So. 806; Bank of Coushatta v. Yarborough, 139 La. 510, 71 So. 784; State v. Bozeman, 156 La. 635, 101 So. 4; State v. Standard Oil Co., 164 La. 334, 113 So. 867; Bruning v. City of New Orleans, 165 La. 511, 115 So. 733; State v. Jefferson Island Salt Mining Co., 183 La. 304, 163 So. 145. See also Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61.

In two of the cases cited, McDade v. Bossier Levee Board and Bank of Coushatta v. Yarborough, the rule was applied to nonnavigable lakes. In the seven other cases cited the rule was applied to navigable lakes.

In McDade v. Bossier Levee Board [109 La. 625, 33 So. 631] it was said: "Whether in Louisiana the beds of lakes can be acquired by accretion or reliction, quære?" But that reservation, obviously, was made with reference only to navigable lakes, because the court held in the McDade case that articles 509 and 510 of the Civil Code dealing with accretion and reliction, or dereliction, were not applicable to the nonnavigable lake—Red Shoot Lake—which the court was dealing with in that case. McDade owned a tract of land adjacent to the lake, under a patent which had been issued to his authors in title under Act 247 of 1855, in which act it was declared that shallow lakes were to be treated as land and to be surveyed and sold as such. After stating that fact (109 La. loc. cit. 634, 33 So. loc. cit. 631) the court said: "This, as a matter of course, excluded all question of accretion or reliction with reference to the bed of this lake."

In the case of the Bank of Coushatta v. Yarborough [139 La. 510, 71 So. 787] the court gave the following reason for holding that the riparian owner on a nonnavigable lake did not acquire title by accretion or dereliction when the lake went dry,—viz.: "It is not suggested that the land here claimed is alluvion, added to that of which the entryman went into possession, 'successively and imperceptibly,' by the waters of a river or a stream (as contemplated by C.C. art. 509), nor yet that it is land which has been left dry by run-

ning water, retiring, imperceptibly, from one of its shores and encroaching upon another (within the meaning of C.C. art. 510)."

In Slattery v. Arkansas Natural Gas Co. the court quoted with approval from Zeller v. Southern Yacht Club, and held: "Article 509 of the Civil Code of Louisiana gives to the owner of the soil situated on the edge of the waters of a river or other stream the accretion, called 'alluvion,' which may 'successively and imperceptibly' be added or 'formed' thereto, but the article has no application to conditions arising upon the shore of a body of water found to be neither a river or stream, but a navigable lake."

The case of Sapp v. Frazier, 51 La.Ann. 1718, 26 So. 378, 72 Am.St.Rep. 493, is not authority, one way or the other, as to whether the riparian rights to accretion and dereliction on a river or other stream, under articles 509 and 510 of the Civil Code, are applicable also to lands bordering upon a lake. The reason why the decision is not authority on that question is that the ruling that the riparian owner did not acquire by dereliction the land which was left dry by the subsidence of the lake in that case was that the subsidence was not a permanent subsidence but only an annual occurrence which lasted only 5 or 6 months in the year. The decision is cited in 112 A.L.R. 1124 as authority for the statement "that an owner of land abutting on a navigable lake could not claim as dereliction the land which was dried up in the summer."

In the case of Miami Corporation v. State, 186 La. 784, 173 So. 315, 325, the court did not overrule the decisions in which it had been held that articles 509 and 510 of the Civil Code did not confer upon a landowner whose land borders on a lake the right to acquire title to the bed of the lake or to any part thereof by accretion or dereliction. On the contrary, the majority opinion in the Miami case was that those decisions were not in conflict with the majority opinion in the Miami case, that when a navigable lake encroached upon the land of a riparian owner the land which became submerged became the property of the State, being public property and being therefore, under articles 450 and 453 of the Civil Code, not susceptible of private ownership. In the Miami case the court was dealing with a navigable lake, called Grand Lake, in Cameron Parish. The lake had encroached upon and submerged a part of the land of a riparian owner; and the question was whether the land which was thus submerged remained the property of the riparian owner or became the property of the State. The court rested its decision, that the submerged area became public property and therefore not susceptible of private ownership, upon articles 450 and 453 of the Civil Code, and held that it was therefore unnecessary to consider articles 509 and 510, referring specifically to riparian rights on a river or other stream. Here is what the court said on the subject in the Miami case:

"The author of the majority opinion [Justice Overton] in State v. Erwin, [173

La. 507, 138 So. 84] was apparently endeavoring to give application to the maxim of Roman Law 'Qui sentit onus, sentire debet et commondum,' the equitable principle underlying the rule of title to alluvion and dereliction in the Civil Law system—referred to in the case of Delachaise v. Maginnis, 44 La.Ann. 1043–1048, 11 So. 715. He must have discerned by reading the decisions of this court that where a riparian owner was claiming alluvion and dereliction which took place along the shores of a navigable lake, he was denied title to this land; whereas, when the State claimed an eroded area along the shore of a navigable lake, the court recognized the State's title to the property, a public thing, as a result of its inherent sovereignty."

\*     \*     \*     \*     \*

"We are further of the opinion that the bed or bottom of Grand Lake, a navigable body of water, including the area in controversy, which has been submerged since 1883, belongs to the State of Louisiana, by virtue of its sovereignty, it being a public thing and insusceptible of private ownership under the provisions of articles 450 and 453 of the Revised Civil Code. Having reached the above conclusion, it is unnecessary to consider the applicability of articles 509 and 510 of the Revised Civil Code to this case."

The explanation which we have given of the decision in the Miami case was made in the case of Amerada Petroleum Corporation v. State Mineral Board, 203 La. at pages 492, 493, 14 So.2d at page

68, where the court decided that a certain body of water called an "arm of Grand Lake" was not a lake but a river or stream. The court quoted with approval the district judge's interpretation of the decision in the Miami case, thus:

" 'Being the last decision on this point we should take it [the Miami case] as controlling, but the Court was careful to state [in the Miami case] that it was not under authority of Article 510 that its decision was based, but under the Article of the Code dealing with public things, particularly Article 453 of the Civil Code. Therefore, this last cited case [Miami case] cannot be authority for a decision of the question confronting us.

" 'It is practically conceded by the contending parties herein that Article 509 with which we are concerned does not apply to lakes or bays or the sea. This is so because the decisions of the Supreme Court have so consistently held. The case of Zeller v. Southern Yacht Club, 34 La.Ann. 837, which so holds, has been consistently followed.

" 'It naturally follows, therefore, that the law on this question is settled and clear. It is contained in Article 509 and the several cases decided thereunder that accretions formed successively and imperceptibly on the shores of rivers or other streams, whether navigable or not, belong to the owners of the property to which they became attached, but that this is not the law in cases of lakes, bays and the sea. This being so the question for decision then naturally becomes one of fact,

that is, is the arm of Grand Lake a lake, or is it a "river or other stream?" ' "

The following cases cited by counsel for Aucoin to support their argument on the subject of accretion and dereliction are not appropriate to this case because the cases cited have reference only to rivers or streams, namely, Palmer Co. v. Wilkinson, 141 La. 874, 75 So. 806; Amite Gravel & Sand Co. v. Roseland Gravel Co., 148 La. 704, 87 So. 718; and Wemple v. Eastham, 150 La. 247, 90 So. 637.

In the case of Palmer Co. v. Wilkinson, 141 La. 874, 75 So. 806, 807, cited by counsel for Aucoin, the plaintiff owned a tract of land bordering upon the nonnavigable stream called Coushatta Bayou, and the plaintiff claimed in its petition: "That its title quoad the bed of the stream is an incident to, and, whether described or not, was intended to be included in, the ownership of the adjacent land. That by its acquisition of said land it acquired a vested right in the bed of the stream to its thread", et cetera. The defendant, Wilkinson, held a mineral lease from the State on the bed of Coushatta Bayou in front of the land of the plaintiff. The important feature of the opinion rendered in the case is the distinction which the court recognized between the rights of a landowner whose land borders upon a nonnavigable *stream* and the rights of one whose land borders upon a nonnavigable *lake*. After analyzing the decision in the McDade case, the court said: "The case [meaning the McDade case] has little or no bearing upon the questions here presented. That persons who buy a stated number of acres of land bordered upon a nonnavigable *body of water* covering 1,000 or 10,000 acres, and *having no current,* at an agreed price per acre, and get possession of all that they buy, are entitled to divide the water bed between them when in the interest of the public and at the public expense it has been drained and made fit for habitation and cultivation, is a proposition which finds no support either in reason or in the law of this state. And where, as is the case in Southern Louisiana, all the lands are traversed by *bayous,* large and small, *creeks, coulées,* and *sloughs,* which in some instances are wholly within the bounds of single plantations and in others border or pass through many plantations, the proposition that in selling the lands the state retained title to the beds of *such streams,* and may introduce a new vendee, or a lessee, into a planter's front yard, or stable lot, with authority to operate an oil derrick, is startling and disturbing, to say the least of it." [The italics are ours.]

At the end of the opinion rendered in that case the court expressly declined to decide whether the title of the plaintiff, as a riparian landowner, extended to the thread of the non-navigable stream, called Coushatta Bayou. The court merely overruled the exception of no "cause of action for the issuance of an injunction" and remanded the case for trial on its merits.

In the case of Amite Gravel & Sand Co. v. Roseland Gravel Co., the plaintiff

owned a tract of land bordering upon the Tangipahoa river, which, the court found from the evidence was a non-navigable river. And, as the court said, the plaintiff rested its suit "upon the theory that its ownership extended to the thread of the stream." [148 La. 704, 87 So. 719] That decision has nothing to do with riparian rights on a lake,—either navigable or non-navigable.

In Wemple v. Eastham the court said: "Plaintiff contends that the two bayous are not and never have been navigable streams," and the court stated: "Defendants admit that Dolet bayou is not, and never has been, a navigable stream."

Another example is the case of Bodcaw Lumber Co. v. Kendall, 161 La. 337, 108 So. 664, where the court stated the issue thus: "The decisive question in the case is whether or not Dorcheat bayou was a navigable stream when Louisiana was admitted into the Union in the year 1812."

On the question whether Lake Long was navigable in 1812 there is a preponderance of evidence in favor of the State. In the first place the Surveyor General must have considered the lake a navigable lake on September 21, 1857, when he approved the Gorlinski survey and on the same day selected for approval to the State under the swamp land grants of 1849 and 1850 all of the vacant lands surrounding the lake, and did not select for approval to the State any land embraced within the Gorlinski traverse of the lake. The Surveyor General must have been informed then that the lake had been

a navigable lake since 1812; otherwise he would have selected also for approval to the State all of the land embraced within the Gorlinski traverse of Lake Long. If the lake was not a navigable lake,— and if therefore the bed of the lake did not belong to the State by virtue of her sovereignty,—the bed of the lake was granted to the State as "overflowed land" by the swamp-land grant of 1849. It was so decided with reference to the non-navigable lake called Red Shoot Lake, in the case of McDade v. Bossier Parish Levee Board, 109 La. at page 633, 33 So. at page 631,—thus: "If Congress had intended that swamp lands alone should pass, why add the word 'overflowed'? The word 'swamp,' without the addition of the word 'overflowed,' would have conveyed all lands so lacking in drainage as to be temporarily covered by water in rainy seasons. If such lands alone were intended to be conveyed, why add the word 'overflowed'? Has the word 'overflowed' any other meaning than 'water-covered'? Water-covered areas are not to be taken out of the operation of the [swamp-land] grant by so simple a process as calling them lakes."

The judge of the district court, in this case, has given a very thorough analysis of the evidence supporting his conclusion that the lake was a navigable lake as long ago as in the year 1812. One of the scientists testified that the lake was at least 700 years old.

There is historical evidence that as long ago as 1827—only 15 years after the decisive date—the water level in Lake Long

and in the neighboring lake called Lake Fields was five feet above that of Bayou Lafourche and of Bayou Terrebonne.

In 1839 the Legislature adopted a resolution, in the regular session of that year, asking the Senators and Representatives in Congress to obtain an appropriation sufficient to open Bayou L'Eau Bleue, in the parishes of Lafourche and Terrebonne, "in order to lower the waters of Lake Long and Lake Fields". The work of opening Bayou Blue Water had been undertaken by the State under authority of an act of the Legislature of March 25, 1835, p. 149. The undertaking was renewed under authority of Act 9 of the Legislature of 1841, and again under authority of Act 273 of 1858. Under that act Joseph Gorlinski was employed to make—and did make—a topographical survey; and in his report of the work he gave warning that the Company Canal (referred in Gorlinski's field notes of his survey of Lake Long in 1857) threatened inundation of the inhabitants along Bayou Terrebonne because there was a five-foot fall from the surface waters of Lake Fields and Lake Long. By Act 185 of 1859 the Legislature made an appropriation "to drain and reclaim the swamp and overflowed lands situated between Bayous Terrebonne and Lafourche in accordance with the report of J. Gorlinski, Civil Engineer."

There is also in the record a series of maps showing that Lake Long was part of a waterway, consisting of canals, bayous and lakes, and extending from New Orleans to Houma, in the Parish of Terrebonne.

Among these maps is one made under authority of the War Department in 1863.

There is also in the record a text book that was used in the schools of Louisiana, called Dimitry's History and Geography of Louisiana, published in 1877, containing a map showing Lake Long and Lake Fields. The book contains a table of the principal lakes in Louisiana, and among them are the names Lake Long and Lake Fields.

In the opinion rendered in the case of Parish of Lafourche v. Parish of Terrebonne, 34 La.Ann. 1230,—62 years ago,—is the following reference to Bayou L'Eau Bleue,—and there is a map in the record showing how the bayou connected Lake Fields and afterwards Lake Long with the gulf,—viz.:

"The next difficulty suggested for solution is the proper location of the Bayou Blue Water, mentioned in the Act of 1822.

"Plaintiff contends that it is the first stream east of Bayou Terrebonne taking its rise near the Lafourche at a short distance from Thibodauxville [now Thibodaux], running to the sea, nearly parallel to Bayou Terrebonne, and sometimes known as Bayou du Chêne.

"Defendant on the other hand locates Bayou Blue Water east of the latter stream, running northeast near Lake Long, until it intersects and forms one stream with another bayou of the same name, flowing out of Lake Fields, and thence running to the sea parallel with Bayou Lafourche."

There is in the record a map made in or before 1881, showing that the Company Canal, referred to in Gorlinski's field notes, entered Lake Long from the west and connected it with Lake Fields on the east. The map shows also the proposed route of a canal that was to be dug for the purpose of connecting Lake Long with Grand Bayou, so as to drain the lake into the bayou.

Hardee's Map of Louisiana, which was made the official map of the State by Act 143 of 1894—that is fifty years ago—shows that Lake Long was then a link in a chain of waterways from New Orleans to Houma. The latest official map showing that fact is one which was made by the Board of State Engineers in 1937, a copy of which we have in our offices, and which, according to its legend, was "made under authority of Act No. 159 of 1928 from the best information available". More important still, perhaps, is a book that was issued by the Engineering Corps of the U. S. Army, which has jurisdiction over all navigable waters in the United States. Under the title "New Orleans District", in the book, is a map showing Lake Long as a link in a chain of navigable waterways, and giving the lake its proper reference number.

In the 2d Session of the 63d Congress, in House Document 610, listing the lakes and streams that might be available in the proposed intracoastal waterway, Lake Long is among the principal lakes named, thus: "The principal lakes are Katamache, Des Almands, Fields, Long, Verret, Palourde, and Grand Lake". And in the

1st Session of the 76th Congress, in House Document 230, is a map showing the intracoastal canal passing through Lake Long.

There is no doubt that Lake Long was not actually navigated by large vessels, or for commercial purposes to a great extent, 132 years ago. The only cargo vessels in those days were sail boats and flat boats, and possibly the old covered freighters called keel boats. The *Clermont* was perhaps the only steamboat in the world in 1812, and her voyages were limited to plying the Hudson River between New York and Albany.

In deciding now whether the State acquired title, by virtue of her sovereignty, to the bed of a lake that is, necessarily, older than the State herself, we must consider how undeveloped water transportation was at the time when Louisiana was admitted into the Union, and we must not confuse the word *navigable* with *navigated*. It was with that distinction in mind that the court defined the term "navigable water" in the case of the State ex rel. Board of Commissioners of the Atchafalaya Basin Levee District v. Capdeville, State Auditor, 146 La. at page 106, 83 So. at page 425,—thus: "What, then, is navigable water? It is that which, by its depth, width, and location is rendered available for commerce whether it be actually so used or not. Under the common law of England, only such waters as were within the ebb and flow of the sea were navigable in law, regardless of their use by the vessels of commerce. That is not the law in this country; the question of navigation

[navigability] is one of fact, depending upon the evidence in each case."

In State v. Jefferson Island Salt Mining Co., 183 La. at page 320, 163 So. at page 150, in deciding that Lake Peigneur, in Iberia Parish, was a navigable lake in 1812, the court quoted from the case entitled The Montello, 20 Wall. 430, 441, 22 L.Ed. 391,—thus: "The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use."

In the case of State v. Jefferson Island Salt Mining Co. there was no dissent from the conclusion that Lake Peigneur was a navigable lake in 1812.

To hold now that Lake Long was not a navigable lake in 1812, and hence that the State did not acquire title to the bed of the lake by virtue of her sovereignty, would impute to the surveyor general who selected for approval to the State all of the vacant land surrounding Gorlinski's traverse of Lake Long in T.17 S., R.18 and 19 E., on September 21, 1857, a failure to perform his duty to select also, for approval to the State, all of the area—including the then water-covered area—embraced within Gorlinski's traverse of Lake Long.

The only issue that was decided or was tendered for decision on the hearing of the rule to show cause why the retracement made by the surveyor Shutts under the orders of the court should not be approved was whether Shutts' retrace-

ment was a true and correct retracement of the segment of the Gorlinski line in front of fractional Sections 56, 66 and 65. We infer from the wording of the protest which Aucoin served upon Shutts at the commencement of his resurvey—and which Aucoin repeated in his answer to the rule to show cause—that Aucoin's contention was that the mean high-water mark in 1857 was in fact about 1,000 feet northeast from the line which Shutts retraced. What Shutts was ordered to do—and what he did—was to retrace the line where Gorlinski had traced it on the ground—without any regard on the part of Shutts as to where Gorlinski should have located the mean high-water line. Shutts started at a known or established corner and thence followed the courses and distances given in Gorlinski's field notes. It matters not now whether the mean high-water mark was actually on the line where Gorlinski ran his traverse line in 1857, or was in fact 1,000 feet northeast from the line which Gorlinski ran. When lands have been disposed of by the government according to a line appearing on an official plat of a government survey, approved by the Surveyor General, the location of the line shown on the official plat is controlling. The rule is stated in Leader Realty Co. v. Lakeview Land Co., 142 La. 169, at page 178 et seq., 76 So. 599, at page 602, thus: "There is no evidence in the record that the Surveyor General or deputy United States surveyor was wrong in his location of the line in question; and if we thought there was an error in that respect, it would not be for us to undertake to correct it. As was said in

Cragin v. Powell, 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566, the power to make or correct surveys of the public lands belongs to the political department of the government, and while the lands are subject to the supervision of the General Land Office, its decisions in such cases are unassailable by the courts, except by a direct proceeding. See, also, Boatner v. Scott, 1 Rob. 546."

And in Carrere v. City of New Orleans, 162 La. 981, at pages 1012–1014, 111 So. 393, at page 404, we quoted the law on the subject, thus:

■ "Whether a government survey as originally made is correct or incorrect is for the land department alone to determine, and as to which the courts have no jurisdiction except by original proceedings in equity. 10 Encyc. of U. S. Supreme Court Reports, p. 80. That proposition was put at rest by the Supreme Court of the United States in Cragin v. Powell, 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566, thus:

" 'That the power to make and correct surveys of the public lands belongs to the political department of the government, and that, whilst the lands are subject to the supervision of the General Land Office, the decisions of that bureau in all such cases, like that of other special tribunals upon the matters within their exclusive jurisdiction, are unassailable by the courts, except by a direct proceeding; and that the latter have no concurrent or original power to make similar corrections, if not an elementary principle of our land law, is settled by such a mass of decisions of this court that its mere statement is sufficient.' "

The instructions to Gorlinski to make a survey of Lake Long must have allowed him, necessarily, the freedom to use his own judgment as to how far from the water's edge he should run his traverse line. His field notes show that the swampy conditions surrounding the lake made it impossible to meander the sinuosities of the mean high-water mark. In fact in his field notes he refers to the impossibility of reaching the lake shore at a certain point where he attempted to reach it.

Our reference to the lack of jurisdiction in the courts to correct errors in government surveys is not an intimation that Gorlinski might have made an error in locating on the ground the mean high-water mark where he did locate it in his traverse of Lake Long. In fact we are impressed with the comment made by the witness J. A. Lovell,—who has been the official surveyor for the Parish of Lafourche for about 24 years and has been surveying in and around that parish for more than 40 years,—on the accuracy and reliability of the surveying done and the field notes left by Joseph Gorlinski almost a century ago.

Our conclusion is that the two judgments appealed from are correct.

The judgments are affirmed.

FOURNET, Justice (dissenting).

The state of Louisiana, claiming title to the bed of Lake Long, instituted this action in boundary against Octave Aucoin, the owner of fractional Sections 56, 65, and 66 in Township 17 South, Range 19 East, in the Southeastern land district of Louisiana,

west of the Mississippi river, to have the boundary line between the two properties fixed as shown by the official plat of survey of Township 17 approved by the Surveyor General of Louisiana in 1857, now on file in the State Land Office.

Admitting that he is the owner of Sections 56, 65, and 66, the defendant, in his answer, denied the state is the owner of any land adjacent or contiguous thereto, contending his title extends into the bed of the lake to the full 640 acres in each section and is not merely to the fractional portions thereof on the banks. In the alternative he pleaded he has acquired these sections in full through the prescription of 10 and 30 years acquirendi causa; and, in the further alternative, that such lands as he did not acquire by the conveyance of these lands he has acquired by accretion or reliction.

The state's position, as shown in its answer to interrogatories on facts and articles, is that it became the owner of the officially surveyed tracts adjacent to Lake Long and divided therefrom by a line of delineation when these tracts were certified, as thus surveyed, to the state by the Secretary of the Interior in 1877, under the Congressional Act of March 2, 1849, 9 Stat. 352, the lake proper being excluded entirely from such survey and certification because of the state's then vested ownership thereof by virtue of its navigability at the time Louisiana was admitted into the Union in 1812, which ownership it has never alienated.

There was judgment in the lower court recognizing the state to be the owner of the bed of Lake Long and the defendant to be the owner of the three fractional sections claimed by him; decreeing that the boundary line between them is that fixed by the Surveyor General of Louisiana in the official plat executed in 1857 and now on file in the State Land Office; ordering that the monuments and markers lost or obliterated establishing such boundary be replaced; and appointing Harry Shutts, a registered and licensed surveyor of this state, to so locate and preliminarily monument such boundary. Subsequently, the court rendered another judgment approving and homologating the process verbal of the survey filed by Shutts in pursuance to the former judgment and ordering Shutts to permanently locate and monument the line as thus homologated as the boundary between the properties of the plaintiff and the defendant. The defendant is appealing from both of these judgments.

It appears that Joseph Gorlinski resurveyed Township 17 South, Range 19 East, of the Southeastern land district of Louisiana, to the west of the Mississippi river, pursuant to a contract of October 19, 1854, and from the field notes of his survey (as shown by the certificate of approval thereon of Wm. J. McCulloh, Surveyor General of Louisiana, dated September 21, 1857), an official plat of this township was made. Subsequently, on April 10, 1877, upon proper application, the general land office of the Department of the Interior, through its secretary, certified to the state of Louisiana, as swamp and overflowed lands, along with other lands of a similar nature, the three fractional sections now owned by the

defendant, which, as reflected by a copy of the official plat of that township drawn from Gorlinski's field notes and reproduced below, are contiguous and, together, form a tract triangular in shape, bounded on one side by the lines meandered by Gorlinski as the south and western boundary of Lake Long.

The defendant deraigns his title to these fractional sections from the state of Louisiana. By its act No. 97 of the General Assembly for the year 1890, the state created the Atchafalaya Basin Levee District, establishing a comprehensive levee system within that district, and, in order that additional means might be provided for carrying

out the purposes of the act, donated to the district thus created *all* of the lands embraced within its limits then belonging to or that might thereafter be acquired by the state. All of the property in Township 17 admittedly falls within the confines of this district, and, on July 9, 1900, its board of commissioners agreed to sell *all* of the lands thus acquired to Wisner and Dresser for a consideration of $120,000. In this contract to sell was contained the provision that the board would transfer title to the property to any one designated by the vendees. Accordingly, on December 14, 1900, the board executed a deed transferring 119,037.73 acres, including the fractional sections now owned by Aucoin, to George C. Metzger, and he, on the 20th of the same month, transferred 100,011.21 acres thereof (including the Aucoin property) to the Terrebonne Land Company, Limited, of New Orleans, Louisiana. It was from that company and one of its subsidiaries, the South Louisiana Land Company, Limited, that Aucoin, on February 10, 1910, for a consideration of $7,768.80 acquired all of these three fractional sections (together with other property) except the NW¼ of the SW¼ and the S½ of the SW¼ of Section 66.

The Revised Civil Code expressly gives to all owners of contiguous estates the right to compel their neighbors to fix and establish the limits of their respective properties when these boundaries have never been determined, or, although once fixed, have been obliterated. Articles 663, 823–855. See, also, Opendenwyer v. Brown, 155 La. 617, 99 So. 482; Villasana v. Stiebing, 161 La. 91, 108 So. 136; Cragin v. Powell, 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566.

In the instant case, because the defendant deraigns his title from the plaintiff, it becomes necessary to determine first the limits to which his estate extends in order that the boundary between the property alleged to be owned by the plaintiff and that owned by the defendant can be fixed. In other words, title determines boundary, not boundary the title.

As pointed out above, a reference to the official plat of Township 17 as made from Gorlinski's field notes, discloses that fractional Sections 56, 65, and 66 are bounded on one side by the series of straight, connected lines meandered by Gorlinski as the south and western boundary of Lake Long. As a general rule, meander lines in governmental surveys disregard the minor sinuosities of the shore, marking, instead, the general contour of the body of water thus meandered. For this reason the lines are usually some distance back from the water's edge and "whenever the government plat shows a subdivision to be bounded by meandered water, *unless there is a clear intention to the contrary,* it is the water itself, and not the meander line, which forms the boundary; the latter merely marks the limit of the acreage of which the government took cognizance in its disposition of the tract," constituting the abutting owner a riparian proprietor vested with all of the rights appertaining thereto by extending his title "to the water's edge, and thus include the unmeasured strips which usually exist between it and the meander line." Section 66, Patton on Titles. This is so overwhelmingly the rule in both the state and federal courts that the authorities sustaining it are

endless. Schurmeier v. St. Paul & P. R. Co., 10 Minn. 82, 10 Gil. 59, 88 Am.Dec. 59, affirmed by the U. S. Supreme Court at 7 Wall. 272, 19 L.Ed. 74. Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 838, 35 L.Ed. 428; Mitchell v. Smale, 140 U.S. 406, 11 S.Ct. 819, 840, 35 L.Ed. 442; United States v. Lane, 260 U.S. 662, 43 S.Ct. 236, 67 L.Ed. 448; United States v. Otley, 9 Cir., 127 F.2d 988; Johnson v. Hurst, 10 Idaho 308, 77 P. 784; Ulbright v. Baslington, 20 Idaho 539, 119 P. 292, 294; Olson v. Thorndike, 76 Minn. 399, 79 N.W. 399; Reno Brewing Co. v. Packard, 31 Nev. 433, 103 P. 415, affirmed at 104 P. 801; Lamprey v. State, 52 Minn. 181, 53 N.W. 1139, 18 L.R.A. 670, 38 Am. St.Rep. 541; Lattig v. Scott, 17 Idaho 506, 107 P. 47; Gardner v. Green, 67 N.D. 268, 271 N.W. 775; Knudsen v. Omanson, 10 Utah 124, 37 P. 250; Schlosser v. Crookshank, 96 Iowa 414, 65 N.W. 344; Heald v. Yumisko, 7 N.D. 422, 75 N.W. 806; Sherwin v. Bitzer, 97 Minn. 252, 106 N.W. 1046; Tucker v. Kruse, 126 Minn. 214, 148 N.W. 60; Stoner v. Rice, 121 Ind. 51, 22 N.E. 968, 6 L.R.A. 387; Everson v. City of Waseca, 44 Minn. 247, 46 N.W. 405; Ladd v. Osborne, 79 Iowa 93, 44 N.W. 235; Foss v. Johnstone, 158 Cal. 119, 110 P. 294; Kraut v. Crawford, 18 Iowa 549, 87 Am. Dec. 414; Sizor v. Logansport, 151 Ind. 626, 50 N.E. 377, 44 L.R.A. 814; Jefferis v. East Omaha Land Co., 134 U.S. 178, 10 S.Ct. 518, 33 L.Ed. 872; Hanson v. Rice, 88 Minn. 273, 92 N.W. 982; Provins v. Lovi, 6 Okl. 94, 50 P. 81; Johnson v. Tomlinson, 41 Or. 198, 68 P. 406; State ex rel. Davis v. Superior Court for Cowlitz County, 84 Wash. 252, 146 P. 609; Kean v. Calumet Canal & I. Co., 190 U.S. 452, 23 S.Ct.

651, 47 L.Ed. 1134; Barringer v. Davis, 141 Iowa 419, 120 N.W. 65; State v. Livingston, 164 Iowa 31, 145 N.W. 91; and Producers' Oil Co. v. Hanzen, 238 U.S. 325, 35 S.Ct. 755, 59 L.Ed. 1330, affirming 132 La. 691, 61 So. 754. "The rule, that the water itself rather than the meander line is the boundary, has been adhered to even in extreme cases, in which the strip between the line and the shore reached an area explainable only by a gross error in the survey." Section 66, Patton on Titles.

However, as has been very aptly pointed out in 8 Am.Jur. 752, Section 11, "There is much apparent confusion and uncertainty as to the proper location of boundaries of land bordering on waters and water courses arising in a large measure from conflicting views as to the ownership, as between the state and the individual, of the land between the high and low watercourse. *This question of ownership as between the individual and the sovereign or the state may turn upon whether the waters are tidal or nontidal, and if they are nontidal, whether they are in fact navigable.* The doctrines of accretion and avulsion also have a direct bearing on the location, and the shifting of the location, of boundaries on watercourses and bodies of water." And in that same authority, in Section 14, under the heading "Inland Lakes and Natural Ponds," it is pointed out that "the determination of the boundary line of land bordering on inland lakes and natural ponds depends to a considerable extent upon the question of ownership of the bed of the lake or pond as between the public and the private owners of the upland, which in turn

may be dependent upon whether the waters are navigable or non-navigable. In this country * * * *according to the generally accepted doctrine, the boundries of owners of land abutting upon the navigable lakes extend only to the low watermark* (under the jurisprudence of Louisiana it is the high watermark, see Sapp v. Frazier, 51 La.Ann. 1718, 26 So. 378 [72 Am.St.Rep. 493]; State v. Bayou Johnson Oyster Co., 130 La. 604, 58 So. 405; State v. Capdeville, 146 La. 94, 83 So. 421; State v. Bozeman, 156 La. 635, 101 So. 4; State v. Jefferson Island Salt Mining Co., 183 La. 304, 163 So. 145; and Miami Corporation v. State, 186 La. 784, 173 So. 315), *the title to the bed of the lake being in the state, while the bed of a non-navigable lake or natural pond is generally deemed to be property of the adjoining landowners.* When the bed of an inland water is subject to private ownership, the question whether the title to any part thereof passes by a conveyance of lands bordering upon the water depends upon the intention of the parties as manifested in the words of conveyance. There is, however, a very strong presumption that the grantor intends to convey all the land he owns under the water," which may be "negatived by express words or by other words of description which clearly excludes the lake bed from the land conveyed." (Brackets and italics mine.)

It is apparent, therefore, that the first important question to be determined is whether or not Lake Long was navigable when Louisiana was admitted into the Union in 1812; if it was, title to the bed thereof vested in the state at that time by virtue of

her sovereignty. Sapp v. Frazier, 51 La. Ann. 1718, 26 So. 378, 72 Am.St.Rep. 493; Hall v. Board of Com'rs of Bossier Levee Dist., 111 La. 913, 35 So. 976; State v. Bayou Johnson Oyster Co., 130 La. 604, 58 So. 405; Perry v. Board of Commissioners, 132 La. 415, 422, 61 So. 511; State v. Richardson, 140 La. 329, 72 So. 984; State v. Capdeville, 146 La. 94, 83 So. 421; State v. Bozeman, 156 La. 635, 101 So. 4; Smith v. Dixie Oil Company, 156 La. 691, 101 So. 24; State v. Jefferson Island Salt Mining Company, 183 La. 304, 163 So. 145, certiorari denied 297 U.S. 716, 56 S.Ct. 591, 80 L.Ed. 1001; Miami Corporation v. State, 186 La. 784, 173 So. 315, certiorari denied by the United States Supreme Court 302 U.S. 700, 58 S.Ct. 19, 82 L.Ed 541; Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331; Scott v. Lattig, 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490, 44 L.R.A.,N.S., 107; State of Oklahoma v. Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed 771; United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed 844; Barney v. City of Keokuk, 94 U.S. 324, 24 L.Ed. 224; Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 838, 35 L.Ed. 428; Pollard v. Hagan, 3 How. 212, 11 L.Ed. 565; Coyle v. Smith, 221 U.S. 559, 573, 31 S.Ct. 688, 55 L.Ed. 853; Packer v. Bird, 137 U.S. 661, 666, 11 S.Ct. 210, 34 L.Ed. 819; St. Anthony Falls Water-Power Co. v. Board of Water Com'rs, 168 U.S. 349, 361, 18 S.Ct. 157, 42 L.Ed. 497; Broward v. Mabry, 58 Fla. 398, 50 So. 826; and L.R.A.1916C, 150.

The rule laid down by the Supreme Court of the United States, and followed in this state, is that streams, lakes, and other bodies of water that are navigable in fact are navi-

gable in law, and, to be navigable in fact, it is necessary that they either be used or be susceptible of being used "in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." The Daniel Ball (The Daniel Ball v. United States), 10 Wall. 557, 563, 19 L.Ed. 999. See, also, Boykin & Lang v. Shaffer, 13 La.Ann. 129; McCearley v. Lemennier, 40 La.Ann. 253, 3 So. 649; Egan v. Hart, 45 La.Ann. 1358, 14 So. 244; Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249; Delta Duck Club v. Barrios, 135 La. 357, 65 So. 489; State v. Capdeville, 146 La. 94, 83 So. 421; Amite Gravel & Sand Co. v. Roseland Gravel Co., 148 La. 704, 87 So. 718; State v. Sweet Lake Land & Oil Co., 164 La. 240, 113 So. 833; State v. Jefferson Island Salt Mining Co., 183 La. 304, 163 So. 145; Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914; Harrison v. Fite, 8 Cir., 148 F. 781, 78 C.C.A. 447; Woodman v. Pitman, 79 Me. 456, 10 A. 321, 1 Am.St.Rep. 342; Hodges v. Williams, 95 N.C. 331, 59 Am. Rep. 242; Haines v. Hall, 17 Or. 165, 175, 20 P. 831, 3 L.R.A. 609; Hurst v. Dana, 86 Kan. 947, 122 P. 1041, 1042; Webster v. Harris, 111 Tenn. 668, 69 S.W. 782, 59 L.R.A. 324; Willow River Club v. Wade, 100 Wis. 86, 76 N.W. 273, 42 L.R.A. 305; The Montello (United States v. the Montello), 87 U.S. 430, 22 L.Ed. 391; State of Oklahoma v. Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771; Bodcaw Lumber Co. v. Kendall, 161 La. 337, 108 So. 664; Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 43 S.Ct. 60, 67 L.Ed. 140; Perry v. Haines, 191 U.S. 17, 24 S.Ct. 8, 48 L.Ed.

73; United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844; United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465; and United States v. Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267.

It is impossible to lay down a hard and fast rule under which navigability can be tested. The question is purely one of fact, dependent upon the evidence in each case (State v. Capdeville, 146 La. 94, 83 So. 421; Broward v. Mabry, 58 Fla. 398, 50 So. 826; Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249; United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844; United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243; State of Arizona v. California, 283 U.S. 795, 51 S.Ct. 18, 75 L.Ed. 717; United States v. Ladley, D.C., 42 F.2d 474; Atchafalaya Land Co. v. James, 146 La. 109, 83 So. 426; Caddo Levee District v. Glassel, 120 La. 400, 45 So. 370; Proctor v. Sim, 134 Wash. 606, 236 P. 114; Smith v. State, 184 Wash. 58, 50 P.2d 32; Lefevre v. Washington Monument & Cut Stone Co., 195 Wash. 537, 81 P.2d 819; Strand v. State, 16 Wash.2d 107, 132 P.2d 1011; City of Havre de Grace v. Harlow, 129 Md. 265, 98 A. 852; American River Water Co. v. Amsden, 6 Cal. 443; 29 Cyc. 293; and Ewell v. Lambert, 177 Va. 222, 13 S.E.2d 333) and the state, having made the assertion in this case, has the burden of proving, by evidence that is both clear and convincing, that Lake Long was navigable in 1812. Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249; McCluskey v. Meraux & Nunez, La.App., 186 So. 117, 119; Rhodes v. Otis, 33 Ala. 578, 73 Am.Dec.

439; Jones v. Johnson, 6 Tex.Civ.App. 262, 25 S.W. 650; McKinney v. Northcutt, 114 Mo.App. 146, 89 S.W. 351; Olive v. State, 86 Ala. 88, 5 So. 653, 4 L.R.A. 33; Morrison v. Coleman, 87 Ala. 655, 6 So. 374, 5 L.R.A. 384; Harrison v. Fite, 8 Cir., 148 F. 781, 78 C.C.A. 447; Mintzer v. North American Dredging Co., D.C., 242 F. 553, affirmed at 9 Cir., 245 F. 297; Burner v. Nutter, 77 W.Va. 256, 87 S.E. 359; and 45 C.J. 418, § 18.

My appreciation of the evidence in the record is that the state has failed to establish the navigability of Lake Long. I think the evidence not only shows this lake was not navigable in 1812, but that it has never been navigable at any time within the recorded or existing memory of man. Equally applicable in this case is the statement to be found in the case of State v. Sweet Lake Land & Oil Co., 164 La. 240, 113 So. 833, 836, that *"The lake was never useful or available for navigation or commerce, or of any more importance to the public at any time in the memory of man than it is today."* (Italics mine.)

The state sought by various maps, books, documents, and other detailed scientific evidence, to show that Lake Long was in existence and navigable at the time Louisiana became a state, and while this evidence unquestionably establishes the existence of the lake at that time, it is totally lacking in proof of the lake's navigability.

"To meet the test of navigability as understood in the American law a water course should be susceptible of use for purposes of commerce or possess a capacity for valuable flotage in the transportation to market of the products of the country through which it runs. *It should be of practical usefulness to the public as a public highway in its natural state and without the aid of artificial means. A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable, is not sufficient.* While the navigable quality of a water course need not be continuous, yet it should continue long enough to be useful and valuable in transportation; and the fluctuations should come regularly with the seasons, so that the period of navigability may be depended upon. *Mere depth of water, without profitable utility, will not render a water course navigable in the legal sense,* so as to subject it to public servitude, nor will the fact that it is sufficient for pleasure boating or to enable hunters or fishermen to float their skiffs or canoes. To be navigable a water course must have a useful capacity as a public highway of transportation." Harrison v. Fite, 8 Cir., 148 F. 781, 783, 78 C.C.A. 447. This rule has been tersely stated in Wethersfield v. Humphrey, 20 Conn. 218, thusly: For a stream to be navigable, "there must be some commerce and navigation which is *essentially* valuable," and in Taylor Fishing Club v. Hammett, Tex.Civ.App., 88 S.W.2d 127, 129, thusly: "It must either alone or in connection with other bodies of water connect points between which it is practical to transport commerce by water." (Italics mine.)

This test was somewhat modified in the case of the United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 300, 85 L.Ed. 243, where the court

stated that *"for the purpose of the regulation of commerce,"* navigability, by reason of artificial aids, may arise later than the formation of the Union or the admission of the states, but the court carefully pointed out that "navigability to fix ownership of the river bed or riparian rights is determined" as of the time the states were admitted into the union, in which case, the test laid down in the Fite case is applicable.

There seems to be no doubt that Lake Long was, at one time, a large body of fresh impounded water, having a depth that varied from a few inches to five feet above the waters of Bayous Lafourche and Terrebonne, the water therein levelling with and losing itself in the surrounding swamps and lowlands. The Gorlinski survey discloses that the lake, in addition to being surrounded by "cypress swamps" and "impassable prairie,", had no inlet, no outlet, and no natural channel of accessibility. It is true that in 1830, *18* years *after* Louisiana was admitted into the Union, there was constructed, between Bayous Lafourche and Terrebonne, a canal that cut across the northern end of Lakes Long and Field, and while there is some testimony in the record tending to show that this *canal* was navigated by barges (the Intercoastal Canal, more recently constructed, follows this same course), there is also evidence to show that this canal was not only not in existence when Louisiana became a state in 1812, but that the lake proper, even after the construction of the canal, was not then and has never at any time within the memory of man been a highway for commerce. In fact, the construction of these canals has only served to reduce the lake from the large body of fresh water, with the appreciable depth accredited to it prior to this activity, to a shallow and much smaller body of water that is now almost completely clogged with water lilies, some portions of its bed, because of the reclamation of this area, being under cultivation. Other portions of the bed of Lake Long are presently used for pasturage, and a house, constructed on a ridge forming a part of the lands in controversy, is now occupied by a son of the defendant.

The witnesses are unanimous in their assertion that Lake Long has never been actually navigated. The testimony of the oldest inhabitants in this section is to the effect that the pirogues and canoes used by persons hunting, fishing, and trapping in the vicinity are the only boats that have ever been floated on the lake, and that these, on numerous occasions, not only bogged in the mud, but had to be dragged through the slush. This court, as well as the Supreme Court of the United States, has repeatedly held that such use of a body of water does not establish its navigability. Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249; Delta Duck Club v. Barrios, 135 La. 357, 65 So. 489; State v. Sweet Lake Land & Oil Co., 164 La. 240, 113 So. 833; Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914; United States v. Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L. Ed. 1267; United States v. Rio Grande Dam & Irrig. Co., 174 U.S. 690, 698, 19 S. Ct. 770, 43 L.Ed. 1136, 1139; The Montello, 20 Wall. 430, 22 L.Ed. 391; Harrison v. Fite, 8 Cir., 148 F. 781, 78 C.C.A. 447;

North American Dredging Co. v. Mintzer, 9 Cir., 245 F. 297; Toledo Liberal Shooting Co. v. Erie Shooting Club, 6 Cir., 90 F. 680, 682; United States v. Otley, 9 Cir., 127 F.2d 988; and Rowe v. Granite Bridge Corporation, 21 Pick., Mass., 344.

Since Lake Long is not now and was never in fact navigable, the doctrine universally prevailing in both the common and civil law countries, including this state, that the bed of a non-navigable body of water is deemed to be the property of the adjoining landowners to the center thread thereof, unless a contrary intention is evident in the deed, patent, or grant under which the lands were conveyed, must prevail. Palmer Co. v. Wilkinson, 141 La. 874, 75 So. 806; Amite Gravel & Sand Co. v. Roseland Gravel Co., 148 La. 704, 87 So. 718; Wemple v. Eastham, 150 La. 247, 90 So. 637; Bodcaw Lumber Co. v. Kendall, 161 La. 337, 108 So. 664; Forsyth v. Smale, Fed.Cas.No. 4,950, 7 Biss. 201; Schurmeier v. St. Paul & P. R. Co., 10 Minn. 82, 10 Gil. 59, 88 Am.Dec. 59, affirmed by the United States Supreme Court at 7 Wall. 272, 19 L.Ed. 74; Banks v. Ogden, 69 U.S. 57, 2 Wall. 57, 17 L.Ed. 818; Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 838, 35 L.Ed. 428; Lamprey v. State, 52 Minn. 181, 53 N.W. 1139, 18 L.R.A. 670, 38 Am.St. Rep. 541; State v. Superior Court, 84 Wash. 252, 146 P. 609; Chandos v. Mack, 77 Wis. 573, 46 N.W. 803, 10 L.R.A. 207, 20 Am. St.Rep. 139, and authorities in the annotation found there; Sherwin v. Bitzer, 97 Minn. 252, 106 N.W. 1046; Sizor v. Logansport, 151 Ind. 626, 50 N.E. 377, 44 L.R.A. 814; Welch v. Browning, 115 Iowa 690, 87

N.W. 430; Hanson v. Rice, 88 Minn. 273, 92 N.W. 982; Castle v. Elder, 57 Minn. 289, 59 N.W. 197; Shell v. Matteson, 81 Minn. 38, 83 N.W. 491; Kirkpatrick v. Yates Ice Co., 45 Mo.App. 335; In re Tucker, 126 Minn. 214, 148 N.W. 60; Wood v. Appal, 63 Pa. 210; Beckman v. Kreamer, 43 Ill. 447, 92 Am.Dec. 146; June v. Purcell, 36 Ohio St. 396; Hinckley v. Peay, 22 Utah 21, 60 P. 1012; Foss v. Johnstone, 158 Cal. 119, 110 P. 294; Lattig v. Scott, 17 Idaho 506, 107 P. 47, reversed on other grounds at 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490, 44 L.R.A.,N.S., 107; Stoner v. Rice, 121 Ind. 51, 22 N.E. 968, 6 L.R.A. 387; Sections 81 and 82 of Patton on Titles; 45 C. J. 536, § 207; 5 Cyc. 897; Packer v. Bird, 137 U.S. 661, 11 S.Ct. 210, 34 L.Ed. 819; Johnson v. Johnson, 14 Idaho 561, 95 P. 499, 24 L.R.A.,N.S., 1240; and Middleton v. Pritchard, 3 Scam. 510, 4 Ill. 510, 38 Am. Dec. 112.

In other words, the owner of land adjoining a meander line that is not *clearly* the boundary of his property is, under *all* of the authorities, a riparian proprietor, since his title extends to and embraces all of the land lying between such meander line and the water's edge, and, as such, he is vested with all of the valuable property rights arising from the upland's connection with the water. Consequently, since under the jurisprudence of this state, the title of a riparian proprietor on a non-navigable stream extends into the bed to the center thread thereof, that thread is the boundary of his property, and it matters not that the waters, for reasons artificial or natural, advance or recede. He is entitled to fol-

low this shifting water line to such boundary. "The incalculable mischiefs that would follow if a riparian owner is liable to be cut off from access to the water, and another owner sandwiched in between him and it, whenever the water line had been changed by accretions or relictions, are self-evident, and have been frequently animadverted on by the courts. These considerations certainly apply to riparian ownership on lakes as well as on streams. * * * The owners of lands bordering on them have often bought with reference to access to the water, which usually constitutes an important element in the value and desirability of the land." Any other rule " * * * would simply open the door for prowling speculators to step in and acquire title from the state to any relictions produced in the course of time by the recession of the water, and thus deprive the owner of the original shore estate of all riparian rights, including that of access to the water. The endless litigation over the location of the original water lines, and the grievous practical injustice to the owner of the *original* riparian estate, that would follow, would, of themselves, be a sufficient reason for refusing to adopt any such doctrine." Lamprey v: State, 52 Minn. 181, 53 N.W. 1139, 1142, 18 L.R.A. 670, 38 Am.St. Rep. 541.

· As Chief Justice Monroe expressed it in the case of Palmer Co. v. Wilkinson, 141 La. 874, 75 So. 806, 810, " * * * where, as is the case in Southern Louisiana, all the lands are traversed by bayous, large and small creeks, coulees, and sloughs, which in some instances are wholly within the

bounds of single plantations and in others border or pass through many plantations, the proposition that in selling the lands the state retained title to the beds of such streams, and may introduce a new vendee, or a lessee, *into a planter's front yard, or stable lot, * * * is startling and disturbing, to say the least of it. * * * Rural estates have always been bought and sold here with reference to the* streams that furnish their water supply, and to the *law which declares that he whose estate borders on running water, or through whose estate water runs, may use it as it runs* (C. C. art. 661), *and that the accretions formed successively and imperceptibly to the soil situated on the edge of a river or stream, whether navigable or not, belong to the owner of the soil* (C.C. art. 509), *and those provisions have been read into the titles to all the lands bordering upon all the streams, and through which streams have run, in this territory, since and before the state was created, and have vested in the owners of such lands the rights to which they refer."* (Italics mine.)

The Lamprey case is recognized as a landmark decision on this subject and the Supreme Court of Utah, in the case of Knudsen v. Omanson, 10 Utah 124, 37 P. 250, 251, quoting the above reasoning with approval, said: " * * * whatever the foundation, the rule itself is too firmly fixed by both reason and authority to admit of successful controversy, and it is a rule both just and salutary." To this we might add that it appears to us this rule has not only withstood the test of time, but also all onslaughts levelled against it throughout the

existence of the Roman, civil, and common law. Necessarily, therefore, it has the presumption of common sense behind it. Definitely, no other rule will determine with certainty just how far title to land bordering on nonnavigable streams extends or where it ends.

Counsel for the state apparently concede the law to be as above stated, but they contend the Gorlinski meander line was *intended* to be the outer or northern boundary of the defendant's property, arguing, in support thereof, (1) that the survey does not show the contour of the lake, but, rather, a series of straight lines running at designated angles as the surveyed line; (2) that the field notes do not call for a body of water as the boundary; and (3) that the difference in the acreage between the high banks and that within the Gorlinski line is so great that "there is no rule of reason, logic, honesty or law by which Aucoin" would get more land than was intended to be sold or was supposed to be purchased or was actually paid for, citing, as authority, the cases of Security Land & Exploration Co. v. Burns, 87 Minn. 97, 91 N.W. 304, 63 L.R.A. 157, 94 Am.St.Rep. 684, affirmed by the United States Supreme Court at 193 U.S. 167, 24 S.Ct. 425, 48 L.Ed. 662; French-Glenn Live Stock Co. v. Springer, 185 U. S. 47, 22 S.Ct. 563, 46 L.Ed. 800; and Land v. Brockett, 162 La. 519, 110 So. 740.

The rules of law enunciated in these three cases clearly have no application to the facts of this case as we find them to be. In the Security Land & Exploration Co. case, the court found, as a fact, and pointed out, that while the surveyor who had been employed to survey Township 57 in St. Louis county, Minnesota, did run and mark the exterior lines of the township, with the exception of the south line, which had been previously surveyed, *"He made no survey of the interior of the township, and no section lines therein were ever run by him, and no section or quarter-section corners were ever located or marked by him * * · * and none of the streams or permanent lakes, of which there were several in the township, were meandered by him.* He, however, made, and filed with the United States surveyor general of the state of Minnesota, what purported to be field notes of a survey of the township, purporting to give the length and directions of all interior section lines therein, the location of all section and quarter-section posts and the bearing trees thereof, the character of the soil and timber, and all other data and information required, by the statutes of the United States and the rules of the general land office, to be ascertained and reported by deputy surveyors in due course of making surveys of public lands. With the exception of the description of the survey of the three exterior boundary lines of the township actually run by him, *the field notes returned by him were imaginary and fictitious, and were, in fact, false and erroneous."* The result of such fictitious survey was that the government was cheated and defrauded of "at least 1,000 acres *of high, tillable land, which has never been a part of the lake, and which was and is heavily timbered with trees of more than a century's growth, and growing down to the water's edge."* This high, tillable land existed between the *imaginary* meander line

of the *falsified* survey and the water's edge proper. Under these circumstances, the court concluded that "The official plat was only intended to be a picture of the actual conditions on the ground; but the *fraudulent mistake* in the plat in this case was so gross that no man actually viewing the premises could possibly be misled, or believe that the shore line of the lake was intended as the boundary line of the lots." (Italics mine.)

The French-Glenn Live Stock Company case presents a somewhat similar situation. The jury in the lower court had found, as a matter of fact, that no lake actually fronted the fractional sections or lots purported to abut thereon, and the Supreme Court of the United States, refusing to disturb these findings, which were so amply supported by the evidence in the record, said [185 U.S. 47, 22 S.Ct. 566, 46 L.Ed. 800]: " * * * we think that, while the plats are conclusive as to the meander line, and while if there was a lake abutting on or to the north of the lots, the plaintiff in error would take all land between the meander line and the water, and all accretions, *it was competent for the defendant to show that there was not, at the time of the survey nor since, any such lake, and to contend that, in such a state of facts, there could be no intervening land and no accretion by reliction."* (Italics mine.)

In the Land case [162 La. 519, 110 So. 741], the court pointed out that "The land in contest is a part of the *upland* areas that were *omitted* from the Warren survey (made in 1838) * * *. It is above the 172-foot contour line established by the United States government as the mean high-water level in 1812. *The land was therefore not in the bed of the lake when Warren made his survey."* The court also found that there was no explainable reason for the omission of this area from the survey, since it appeared from the field notes the acreage omitted formed a peninsular tract of *highland* heavily timbered with oak, gum, hickory, and pine trees, and that what had actually happened had been that the survey had cut across the base of this peninsular *instead of traversing the lake shore around it.* Under these circumstances the court concluded that the government had obviously had no intention of conveying such land to the patentee of the fractional section. (Italics and brackets mine.)

There can be no doubt that the government's grant of the land in controversy to the state, its conveyance by the state to the levee board, and the levee board's sale thereof to defendant's ancestors in title was with reference to the official plat of the Gorlinski survey. A mere glance at this plat will disclose that there is nothing thereon to distinguish the meander line from the shore line. The necessary inference, since it is to be presumed the government surveyor did his duty and marked the lake as it existed at the time of the survey, is that the meander line as thus established coincided with the shore line of Lake Long, or so nearly so that they were mapped as one. See Barringer v. Davis, 141 Iowa 419, 120 N.W. 65; Sherwin v. Bitzer, 97 Minn. 252, 106 N.W. 1046; and Gardner v. Green, 67 N.D. 268, 271 N.W. 775.

I think the evidence clearly establishes the fact that Gorlinski surveyed the lake as he found it to be and meandered it according to the conditions at that time. This is borne out by his field notes, for he states that after meandering Lake Field, adjacent to Lake Long and lying in approximately the same direction, he then proceeded through open prairie swamp and set up a post on the "North *edge* of Lake Long," proceeding from thence "with Traverse of Lake Long down and around," crossing the *mouth* of the company canal (traversing the lake at its northern end), the *mouth* of Bayou Aquillar (entering the lake at the extreme southern or lower end), establishing a post at Palmetto Camp "on the *bank* of the lake," and proceeding from there to the "place of beginning." The plat, made from these approved field notes, does not disclose any difference between the meander line and the water's edge. Nor does it show any *high* or *upland* beyond the meander line. (Italics mine.)

With this plat before it, the federal government certified to the state *all* of the lands in Township 17 that were swamp or overflowed lands, not, at that time privately owned. The state, in turn, conveyed *all* such land to the levee board and the levee board sold *all* of this land to defendant's ancestors in title. In none of these transfers *is the conveyance by lot number or by the acreage therein.* The state gave this land to the levee board created for the specific purpose of building levees to protect the land from overflow and to reclaim such overflowed land, and the levee board, in disposing of it for the purpose of securing the funds with which to carry out this reclamation, sold *all* of it "lock, stock, and barrel," to Wisner and Dresser for the flat sum of $120,000. As counsel for the state so aptly puts it in his answer to the defendant's plea of prescription, *"Aucoin got whatever the Levee Board got. The Levee Board got whatever the State transferred to it. If the transfer from the State included what Aucoin now claims, he has it without prescription."*

A mere reading of the acts of conveyance and the grants will disclose that no reservations of any kind whatsoever were made in any of these transactions by the federal government, the state, or the levee board.

In a somewhat similar case, Justice Holmes of the United States Supreme Court made the following pertinent statement: " * * * the land was selected as 'swamp and overflowed lands' by the state. *It not appearing otherwise,* the selection must be presumed to have included the land overflowed, and if so it was confirmed to the state by the act of March 3, 1857, chap. 117 (11 Stat. at L. 251, Rev.Stat. § 2484, U.S.Comp.Stat.1901, p. 1588 [43 U.S.C.A. § 986]). * * * The land surrounding the water, at least, was surveyed, so that the identification of the submerged portion was absolute. *We are of opinion that the state of Indiana got a title to the whole land in dispute. If the state of Indiana got a title, it gave one.* There is not much controversy on this point." Kean v. Calumet Canal & Irrig. Co., 190 U.S. 452, 23 S.Ct. 651, 652, 47 L.Ed. 1134. See, also, State v. Livingston, 164 Iowa 31, 145 N.W. 91; and

Barringer v. Davis, 141 Iowa 419, 120 N.W. 65. (Italics mine.)

There is nothing in the record to indicate any affirmative intention on the part of the state to limit its grant of land in Township 17 to the levee board or an intention on the part of the levee board to limit its conveyance of this land to defendant's ancestors in title to the meander line, as a mere reference to either of these written instruments or Gorlinski's field notes and the plat drawn therefrom will disclose. There is nothing in the record to indicate fraud on the part of any one, and, as pointed out previously, there is nothing *on the plat* itself to show that the meander line run by Gorlinski did not in fact coincide with the sinuosities of the lake or its contour lines as they existed at the time of the survey. As a matter of fact, the state introduced, as its exhibit P–34, a "directo" print of a "Plan of the entire valley situated between Bayous Lafourche and Terrebonne," which had been offered in evidence in the case of Parish of Lafourche v. Parish of Terrebonne, 34 La.Ann. 1230, decided in 1882, for the specific purpose of having one of defendant's witnesses admit, under cross-examination, that Lake Long, at *that* time was "in the same shape, and having (had) the same configuration or substantially the same shape and configuration, as given to it on Gorlinski's surveys of 1855 and 1857."

The presumption is that the government in transferring the property in Township 17 to the state, the state to the levee board, and the latter to the ancestor in title of the defendant, all intended to transfer such lands as they then owned in the entire township and did not intend to limit the transfer to the land found within the meander line or to exclude therefrom the strip of land existing between the meander line and the water's edge, if, in fact, such strip of land existed at the time it was surveyed. "To overcome such presumption would require some evidence to show that the grantor, the general government, had done, or attempted to do, some act inconsistent with the presumption; such as having previously surveyed the land in dispute as government land, or conveyed it to others than plaintiffs' remote grantors, or in some manner making a claim to the disputed ground." Schlosser v. Crookshank, 96 Iowa 414, 65 N.W. 344, 346. (It will be remembered that a son of the defendant is now living in a house that has, for some time, been constructed on a ridge forming a part of the lands in controversy, although there is nothing in the record to show that any objection to such usage of the land was ever made by the state.) The court, in that case, further stated that "The general rule * * * is that all grants are to be construed most strictly against the grantors, and *reservations will not be implied*," adding, "*The statement of the number of acres in these patents in no way limits the extent of the grant. To so hold would, in effect, be holding that a meander line was a boundary line, which, as we have seen, is not the case.*" (Italics mine.)

It is obvious from the foregoing that the contention of counsel for the state that the was that actually paid for (because of the only land intended to be sold the defendant

alleged difference in these fractional sections today and when surveyed by Gorlinski), is equally without merit. It is significant that in all of the cases where the courts have restricted the claimant's title to riparian land to the meander line because of an excessive difference between the acreage of high or upland purchased by them without and within such line, the survey under consideration had been made with the view of selling the land by the acre. In the instant case there was no high or upland between the meander line and the shore line of the lake in 1857. Furthermore, it is undisputed that Gorlinski's survey was made for the purpose of segregating the public land in this township from the private land and of ascertaining the character of this public land so that the state might have certified to it under the provisions of the Congressional act of March 2, 1849, the fee-simple title to *"all the swamp lands therein * * * subject to overflow and unfit for cultivation."* Gorlinski's identifying, traversing, and locating of the lakes and other bodies of water in this vicinity, whether navigable or not, was merely incidental thereto. The land at that time, if not actually covered by the waters of the lake, was low, swampy, and marshy, and had little or no value. The state could have had no interest in reserving title thereto since it was disposed of for the very purpose of securing the funds necessary for its reclamation, and, not so incidentally, so that it might be sold to private individuals after reclamation and thus become a source of revenue to the state through tax assessment. As expressed by Justice Dawkins in State v. Capdeville, 146

La. 94, 83 So. 421, 424, " * * * the whole theory upon which the government conveyed these 'swamp and overflowed' lands to the states was that, as the property then stood, it was susceptible of reclamation, through artificial means, or the efforts of man; and, as a condition of the transfer, it was required that the proceeds should be devoted to that end. * * * In other words, the purpose was to offer an inducement to the states, and through them to their citizens, to reclaim and render productive property which otherwise was of little value to anyone in its then condition."

In my opinion the existence of land between the line meandered by Gorlinski in 1857 and the water's edge as it is today is but tangible proof of the success of the reclamation of this area. As explained by Mr. J. A. Lovell, one of the plaintiff's witnesses and the engineer of Lafourche Parish since 1906, "It happened that Lake Long and Lake Fields would accumulate rain water shed off the west side of Bayou Lafourche, and the south side of Bayou Terrebonne. *It was a kind of basin, and the water was impounded, it couldn't get out.* The water followed the shore, and got like a pond, like the water running off a house. *Eventually the Parish cut a canal at the lower end of the lake and ran the water out, and other canals besides that have been cut, and they gradually reduced the water level."* This same witness, in commenting on the Gorlinski survey, stated: " * * * the work done by Gorlinski for the Government is about the most accurate work, and about the easiest for us to trace. It is easier than most of the surveys we

have had. *Gorlinski was more accurate than any other.*" (Italics mine.)

It is my conclusion, that the state has failed to establish it owns property adjacent or contiguous to that of the plaintiff and its suit should, therefore, be dismissed, for "The primary object of the action of boundary, under the Civil Code of Louisiana, is to determine and fix the boundary between contiguous estates of the respective proprietors. *The provision of the Code* in article 845, and other provisions under title 5 of the Code, that the limits must be fixed according to the titles of the parties, *are held * * * to apply to cases in which neither party disputes the title of his antagonist. * * * The title to the property is not allowed to be litigated in this action, whose purpose is to fix a line or boundary between adjoining claims.*" Cragin v. Powell, 128 U.S. 691, 9 S.Ct. 203, 204, 32 L.Ed. 566. See, also, Sprigg v. Hooper, 9 Rob. 248, 253; Zeringue v. Harang's Adm'r, 17 La. 349; and Blanc v. Cousin, 8 La.Ann. 71

For the reasons assigned, I respectfully dissent.